ORIGINAL

Case 4:14-cr-00023-A    Document 157    Filed 07/23/14    Page 1 of 19    PageID 839

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2014 JUL 23  AM 9: 26

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:14-CR-023-A |
| CHRISTOPHER ROBERT WEAST (01) | |

## RESPONSE TO MOTION TO FILE SUPPLEMENTAL DESIGNATION OF EXPERT

TO THE HONORABLE JOHN MCBRYDE, UNITED STATES DISTRICT JUDGE:

The United States Attorney for the Northern District of Texas, by and through the undersigned Assistant United States Attorney, files this response in opposition to Weast's motion to introduce additional expert testimony and would show the Court the following:

On July 18, 2014, Weast filed a motion for leave to supplement its expert designation; the government objected. Also on July 18, 2014, the Court issued an order requiring the defendant to identify by July 22, 2014, the opinions the witness would testify to and the basis and reasons for each opinion.[1]

Weast timely responded to the Court's Order by identifying two subject areas that his "expert" Bill McGregor would testify to in trial: (1) computers are susceptible to remote access and hacking; and (2) it is impossible to look at a visual depiction and know if it depicts an actual minor.

---

[1] Order, ECF 141.

**Response to Motion to Supplement
Expert Designation - Page 1 of 7**

The government objects to this testimony for the reasons below and asks the Court to deny Weast's request to supplement his expert witness designation and to exclude his proposed testimony before the jury.

**Argument and authorities**

District courts are assigned a "gatekeeping role" to determine the admissibility of expert testimony. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993)). Before expert testimony is admissible, the court must find that it is relevant and reliable. *Id.* Part of this finding involves determining whether the expert has "reliably applied the methods in question." *Id.* (citation omitted). Factors that affect reliability include the following:

(1) whether a theory or technique can be tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error;

(4) the existence and maintenance of standards and controls; and

(5) general acceptance of the theory in the scientific or expert community.

*Id.* (citing *Daubert*, 509 U.S. at 593-95).

1. **Testimony about remote access and hacking is irrelevant.**

Weast has provided the areas of testimony this witness would address, but he has not identified any opinions or conclusions specific to this case that he intends to offer.

He also has failed to provide the underlying basis to support his opinions as the Court ordered on July 18, 2014. Without this information, the Court cannot exercise its gatekeeping function and determine whether the testimony is reliable.

The government also submits that the evidence Mr. McGregor proposes to offer is not relevant under Rule 401. To establish that testimony is relevant, Weast must show that

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

FED R. EVID. 401. Whether a fact is "of consequence" is determined by the substantive law that governs an action, which in a criminal case, "consists of elements of the offense charged and any relevant defenses to defeat criminal liability." *United States v. Lamberty*, 778 F.2d 59, 61 (1st Cir. 1985) (citing *United States v. Hall*, 653 F.2d 1002, 1005-06 (5th Cir. 1981).

In terms of expert testimony, the Sixth Circuit has held that experts cannot testify to general issues, but rather must tie their testimony to the facts of the case. In *United States v. LeBlanc*, the Sixth Circuit considered whether the exclusion of an expert in child interviewing techniques was proper in a case involving the sexual assault of a six-year-old girl. 45 Fed.Appx. 393 (6th Cir. 2002) (unpublished opinion, copy attached). The expert was prepared to testify about how a given interviewing technique could suggest the answer to the victim, thereby tainting her statements. *Id.* at 398. The Sixth Circuit— which disagreed with the district court's reasoning—concluded that exclusion of such

Response to Motion to Supplement
Expert Designation - Page 3 of 7

testimony was proper because, at no time did the expert "point to a single instance in which the victim was supposedly subjected to allegedly coercive or suggestive questioning techniques." *Id.* at 399-400, 401. Without connecting the expert's testimony to the facts of the case, the testimony "would have presented the jury with an abstract theory...in the absence of any evidence that such was the case." *Id.*

The same problem exists here. While it may be true that computers can be susceptible to hacking or remote access, the defense has not suggested that their expert will claim that Weast's computer was hacked or remotely accessed by another individual. Additionally, this expert has provided no indication that even if there was evidence of hacking or remote access, that it ties to an element of the offense or a defense. Because general information about hacking or remote access to a computer does not make it more likely or less likely to have occurred in this case, it is not a fact of consequence relevant to the elements of the offense or a defense. Such testimony, then, should be excluded at this time.

2. **Testimony regarding "actual" minor**

   **a. The witness lacks qualifications to render an "expert" opinion regarding whether an image depicts an actual minor.**

The defense provided a copy of Mr. McGregor's resume, a copy of which is attached. While Mr. McGregor lists his experience and training regarding network protection and intrusion prevention, he has not identified any specialized training or knowledge that supports that he has expertise in the area of computer-generated images of minors.

Additionally, this witness has not identified the principles and methods he used to render an opinion regarding the images and video in this case, and again, he has not provided the Court with any evidence that he has reliably applied those principles and methods to the facts of this case.

### b. This testimony also should be excluded pursuant to Rules 401 and 403

Weast's computers were seized in 2012; at least some, if not all, of the charged visual depictions were taken at least several years prior to the date the computers were seized. Mr. McGregor's testimony about the *current* state of technology and software cannot provide any helpful information to the jury that would illuminate whether at the time of the offense was committed the defendant possessed depictions of actual minors. Accordingly, his testimony is not relevant.

Moreover, the testimony about minors that the defense seeks to present to the jury is, in essence, that they cannot rely on their own reasoning and common sense to determine whether the charged images and video depict an actual minor. The government submits such testimony would not be helpful to the jury; rather, it could be misleading and confusing, because the state of the law in the Fifth Circuit and many other circuits is just the contrary—jurors *can* determine whether an image depicts a real minor without the assistance of experts. *See, United States v. Slanina*, 359 F.3d 356, 357 (5th Cir. 2005) (the government was not required to present any additional evidence or expert testimony to meet its burden of proof to show that the images downloaded by [the defendant] depicted real children, and not virtual children."); *United States v. McNealy*, 625 F.3d, 858, 865 (5th Cir. 2010).

**Response to Motion to Supplement**
**Expert Designation - Page 5 of 7**

Other circuits have also held that no expert testimony was required to prove the children depicted in the images are "real." *See, United States v. Rodriquez-Pacheco*, 475 F.3d 434, 441 (1st Cir. 2007); *United States v. Destio*, 153 Fed. Appx. 888, 892, 93 (3d Cir. 2005); *United States v. Farrelly*, 389 F.3d 649, 654 (6th Cir. 2004); *United States v. Lacey*, 569 F.3d 319, 325 (7th Cir. 2009); and *United States v. Hall*, 312 F.3d 1250, 1260 (11th Cir. 2002).

Finally, should the Court conclude that such testimony was based on reliable methodology and relevant, its probative value would be substantially outweighed by the danger of unfair prejudice, confusing the issues and misleading the jury. FED. R. EVID. 403.

## Conclusion

In conclusion, the government submits that Weast still has not provided sufficient information to support introduction of any expert testimony by Mr. McGregor. Additionally, Mr. McGregor lacks the qualifications to render an opinion regarding "actual" minors. Because none of the testimony the defense seeks to offer through this witness has been related to the facts of this case, it would at best, be confusing and misleading to the jury.

Therefore, the government submits his testimony should be excluded.

Respectfully submitted,

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

/s/ Aisha Saleem

AISHA SALEEM
Assistant United States Attorney
Texas State Bar No. 00786218
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817-252-5200
Facsimile: 817-252-5455
Email: aisha.saleem@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2014, the foregoing Government's Response to Weast's Motion for Expert Designation was served by hand delivery to Angela Saad at 819 Taylor Street, Room 9A10, Fort Worth, Texas 76102.

/s/ Aisha Saleem

AISHA SALEEM
Assistant United States Attorney



45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))**

C
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
UNITED STATES of America, Plaintiff–Appellee,
v.
Daniel George LeBLANC, Defendant–Appellant.

No. 01–1517.
Aug. 28, 2002.

Defendant was convicted by jury in the United States District Court for the Western District of Michigan of sexually assaulting his six-year-old step-daughter in his home on Indian reservation, and he appealed. The Court of Appeals held that: (1) police investigator's alleged "promise" to defendant that he could speak with his wife after he spoke with investigator regarding allegations that he had sexually assaulted his step-daughter did not amount to objectively coercive police activity that would render defendant's confession involuntary, and (2) testimony of defense's expert concerning the appropriateness of techniques used to question defendant's six-year-old step-daughter about his alleged sexually assault of her was properly excluded for failure to show relevancy of the testimony.

Affirmed.

West Headnotes

[1] Criminal Law 110 411.54(1)

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)14 Conduct of Interrogation
        110k411.52 Promises; Hope of Benefit
          110k411.54 Nature of Promise
            110k411.54(1) k. In general. Most Cited Cases
    (Formerly 110k520(6))
Police investigator's alleged "promise" to defendant that he could speak with his wife after he spoke with investigator regarding allegations that he had sexually assaulted his step-daughter did not amount to objectively coercive police activity that would render defendant's confession involuntary, where police investigator had merely passed along to defendant an apparent promise made by his wife, not a promise from the police, and although defendant emphasized his allegedly overwrought "mental state" at the time of the interview, investigator testified that defendant appeared to be sober and did not manifest any confusion or lack of understanding.

[2] Criminal Law 110 411.49

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)14 Conduct of Interrogation
        110k411.48 Coercion
          110k411.49 k. In general. Most Cited Cases
    (Formerly 110k519(1))
To show that confession was involuntary, defendant must establish that (1) the police activity was objectively coercive, (2) coercion in question was sufficient to overbear defendant's will, and (3) defendant's will was in fact, overborne as a result of the coercive police activity.

[3] Criminal Law 110 476.6

110 Criminal Law
  110XVII Evidence
    110XVII(R) Opinion Evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

110k468 Subjects of Expert Testimony
110k476.6 k. Miscellaneous matters. Most Cited Cases

Testimony of defense's expert concerning the appropriateness of techniques used to question defendant's six-year-old step-daughter about his alleged sexually assault of her was properly excluded for failure to show relevancy of the testimony; expert failed to point to a single instance in which the step-daughter was supposedly subjected to allegedly coercive or suggestive questioning techniques, and it was clear from the child's testimony at trial that she was able to recount what occurred on the evening in question without undue prompting. Fed.Rules Evid.Rule 402, 28 U.S.C.A.

[4] Criminal Law 110 €⇒469

110 Criminal Law
 110XVII Evidence
  110XVII(R) Opinion Evidence
   110k468 Subjects of Expert Testimony
    110k469 k. In general. Most Cited

Expert testimony is subject to the same relevancy constraints as all other kinds of evidence. Fed.Rules Evid.Rule 402, 28 U.S.C.A.

[5] Criminal Law 110 €⇒338(1)

110 Criminal Law
 110XVII Evidence
  110XVII(D) Facts in Issue and Relevance
   110k338 Relevancy in General
    110k338(1) k. In general. Most Cited Cases

Question of relevance of evidence is a preliminary question for the trial judge.

[6] Criminal Law 110 €⇒480

110 Criminal Law
 110XVII Evidence
  110XVII(R) Opinion Evidence
   110k477 Competency of Experts
    110k480 k. Preliminary evidence as to competency. Most Cited Cases

Proponent of expert testimony must establish its admissibility by a preponderance of proof.

*394 On Appeal from the United States District Court for the Western District of Michigan.

Before KEITH and DAUGHTREY, Circuit Judges, and CARR,[FN*] District Judge.

> FN* The Hon. James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

PER CURIAM.
**1 The defendant, Daniel LeBlanc, was convicted by a jury of sexually assaulting his six-year-old step-daughter in his home in the Bay Mills Indian Community reservation. On appeal, LeBlanc raises a Fifth Amendment challenge to the admission of his out-of-court statements, and he challenges the exclusion of his proffered expert testimony regarding the susceptibility of children to coercive or suggestive interviewing techniques. We find no reversible error and affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to the charge occurred on an evening when the defendant was at home alone with his six-year-old step-daughter, S.S, and his young son. His wife, the children's mother, was away helping a neighbor prepare for a party at a nearby residence. According to LeBlanc's testimony on direct examination, he was sitting on the couch watching a pornographic movie when S.S. entered the room. LeBlanc testified that he put cartoons on the television for her and reclined on the couch. As S.S. sat watching cartoons at the bottom of the couch between LeBlanc's legs, he said, he had thoughts of "having her give me oral sex." He admitted having had such thoughts once before, when S.S. was in the shower with him.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

Page 3

Meanwhile, LeBlanc's wife, Sonja, realized that she had forgotten to bring a pan from home and asked her neighbor, Heather Bowen, to retrieve it. Bowen drove to the LeBlanc residence and walked up to the back door. Through the glass door, Bowen looked into the house and saw LeBlanc lying on the couch with S.S. "laying*395 on top of him," with her "head down in his genital area." Bowen testified that she believed that LeBlanc was "molesting" S.S. She further testified that once LeBlanc became aware of her presence, he quickly "jumped up off the couch" and adjusted his pants. After stepping into the house, Bowen told LeBlanc that she was there to pick up a pan and observed that he was acting "[n]ervous and scared." According to Bowen, LeBlanc gave her the pan, and asked her as she was leaving "not to say anything to anybody."

After leaving the LeBlanc residence, Bowen returned to the party, but she did not tell Sonja what she had seen. However, after talking with a friend on the following Monday, Bowen reported the incident to Child Protective Services, a Michigan state agency. Ultimately, the matter was referred to the Bureau of Indian Affairs for investigation. After interviewing Bowen, BIA investigator Levi Carrick, along with Captain Ben Carrick of the Bay Mills Indian Community police department, decided to interview S.S. and her mother. According to Investigator Carrick, S.S. "confirm[ed]" the allegations of sexual abuse to the investigators.

As a result, Carrick decided to question LeBlanc. Carrick testified that he was preparing to leave the tribal police department's parking lot to drive to LeBlanc's residence, when a car pulled into the lot and the driver motioned to Carrick to return. As Carrick turned his car around, a second car pulled into the lot. The driver of the first car was Sonja LeBlanc, and the driver of the second car was Daniel LeBlanc. Daniel was attempting to talk to his wife, who was rebuffing his attempts. Carrick described the scene in the police department parking lot as follows:

**2 I stepped between the vehicles and asked what the problem was, what's going on. Dan said he just wanted to explain everything to her, but she wouldn't talk to him. I asked if he would explain it to me, and he said no, not until—unless she talks to me. I asked her if she would talk to him after we were—after we were done if he would explain it to me. She said she would. Dan agreed to that, and I offered to go inside the police department and discuss it with [him].

LeBlanc followed Investigator Carrick into a small interviewing room in the police station. Immediately after sitting down, LeBlanc told Carrick that he wanted to "explain everything." According to Carrick, LeBlanc told him that he wanted to explain to Sonja his feelings about his step-daughter and said, "Friday night I was gonna try my daughter. I was gonna have her give me oral sex but it didn't get that far." Carrick recounted to the jury LeBlanc's explanation of what happened the preceding Friday evening:

He said that he was watching a pornographic movie and his daughter walked in, so he turned it off. He was sitting on the couch. He said that he—he laid down and exposed himself. He said he was already erect. He asked his daughter if she wanted to suck him, and she didn't say nothing, so he thought she did. He told her, [c]ome here. She laid on top of him, and he said that she put her hand on his penis and put her mouth on the—on his penis, and the penis went in her mouth just a little ways, just past the teeth, he explained. He said just the tip was in.

And then Heather came to the door, so he pushed her off and jumped up. Heather was after a pan, he said, and he told her that nothing happened. You're not gonna tell anybody, are you? She said, [d]on't worry, I won't say nothing. Then she left.

*396 LeBlanc further explained to the investigator that he had been having sexual thoughts about his step-daughter ever since his wife had told him that she had been sexually abused as a child. The interview lasted about 35–40 minutes. Afterward,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

Investigator Carrick asked LeBlanc if he would make a written statement regarding the events of Friday evening, explaining "that we generally start it that no promises or threats or coercion or any type of force was used against you to make the statement." LeBlanc agreed, and Carrick left him alone for 20-25 minutes to prepare the written statement.

The following is LeBlanc's signed written statement, which was introduced at trial and read to the jury by Investigator Carrick:

I, Daniel LeBlanc, make this statement. There were no promises or threats given to me. This is a voluntary statement.

On Friday night, June 2, I had thought of having my daughter give me oral sex after watching a porno. I know it was wrong, and if I could turn back time, I would. Heather entered my house when I was attempting this incident and said that she didn't see anything, but I knew she did and wasn't going to tell anyone. I knew if I didn't tell Sonja, that she would—that she would find out so how [sic], but over the weekend I just couldn't build up enough courage to tell her. I told [S.S.] not to tell her mom because I would tell her because it was wrong and [S.S.] would not be in trouble ... but Daddy would be. The only time before ... was in the shower when I attempted to and [S.S.] saw and was surprised, so I told her to get dressed because I was having these feelings. Before this occurred I was told a story about Sonja about what happened to her, but I don't ... what went through my mind. If I make things right I willing cooperate in any way possible. I love my kids very much and my wife. If I lose them, what use of living. I cannot go on.

**3 After LeBlanc completed the statement, Officer Baragwanth attempted to find Sonja, but she had already left in her car. The officers asked LeBlanc if he had anywhere else to go, but LeBlanc expressed a desire to return home. Carrick drove LeBlanc back to his house and "asked him not to have any kind of contact with Sonja or the children."

Later that evening, the tribal police department received a phone call regarding a problem at the LeBlanc residence. Officer Donnay went to the house and found a distraught LeBlanc, who asked for his mother and aunt. LeBlanc's mother arrived and performed a "spiritual cleansing" with her son. Officer Donnay, still present at the residence, testified at trial that he overheard LeBlanc tell his mother that "he made a big mistake on Friday" and also recount details of the incident with S.S.

At trial, six-year-old S.S. testified to the circumstances under which she had been led into committing fellatio on the defendant. In response, the defense offered as an expert witness psychologist Terrence Campbell, Ph.D., who proposed to testify regarding "the questioning of [S.S.] and the reliability of her testimony." The government objected and, after a *Daubert* hearing, the district court disallowed the expert's testimony.

Following the jury's verdict of guilty, the district court entered judgment on the verdict and sentenced LeBlanc to 138 months' imprisonment. He now appeals his conviction, challenging the admissibility of his inculpatory statements and the exclusion of his proffered expert witness.

*397 II. *DISCUSSION*
A. The Motion To Suppress.
[1] LeBlanc argues on appeal that his written and oral confessions to Investigator Carrick were subject to exclusion under the Fifth Amendment because Investigator Carrick's "promise" to LeBlanc that he could speak with his wife if he spoke first with investigators "was sufficient to overbear, and did overbear, his will." We conclude that this claim must fail, not only because it is deficient on its merits, but also because LeBlanc has waived his right to present this claim.

Prior to trial, LeBlanc filed a motion to suppress his various statements to law enforcement of-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

ficers, contending that he had not been given his *Miranda* warnings prior to interrogation. After a suppression hearing at which LeBlanc and Investigator Carrick both testified, the magistrate judge issued a report and recommendation to the district court concluding that LeBlanc's statements were not made in a custodial setting and that *Miranda* warnings were, therefore, not required. After LeBlanc failed to file any objections to the magistrate judge's findings, the district court adopted the report and denied the motion to suppress. Under the law of this circuit, a party failing to file objections to a magistrate judge's report waives appellate review, so long as the party receives proper notice of this consequence. *See United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). Here, the magistrate judge's report and recommendation included a clear warning to the parties that objections to the conclusions therein were due to be filed within ten days of receipt of the report, and that "[f]ailure to file timely objections constitutes a waiver of any further right to appeal of those issues or claims addressed or resolved as a result of the Report and Recommendation." LeBlanc failed to file any objections, thus waiving his right to appellate review.

**\*\*4** Moreover, the specific issue raised on appeal, that the statements were the product of coercion, was not presented to the district court and thus is not subject to review on appeal. *See Chandler v. Jones,* 813 F.2d 773, 777 (6th Cir.1987) ("It is a well-established principle of appellate review that appellate courts do not address claims not properly presented below.").

[2] Even if the claim had been properly preserved, there is simply no factual support for it in the record before us. In order to show that a confession was involuntary, the defendant must establish that: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was in fact, overborne as a result of the coercive police activity." *United States v. Rigsby,* 943 F.2d 631, 635 (6th Cir.1991). Here, the only conduct alleged to be coercive is Investigator Carrick's "promise" to LeBlanc that he could speak with his wife after he spoke with Carrick. However, the facts as the magistrate judge found them were that "Investigator Carrick, after speaking with defendant's wife, told defendant that his wife would be willing to talk to defendant after defendant spoke with Carrick." Based upon the magistrate judge's finding, which is supported by Carrick's testimony, it appears that Carrick did nothing more than pass along to LeBlanc an apparent promise made by his wife, not a promise from the police. LeBlanc emphasizes his overwrought "mental state" at the time of the interview, arguing that because of his "desperate state of mind," Carrick's actions must be deemed coercive. The Supreme Court has held, however, that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of **\*398** the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). *See also United States v. Newman,* 889 F.2d 88 (6th Cir.1989) ("Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary."). According to Carrrick's testimony, his encounter with LeBlanc lasted about 40 minutes, during which LeBlanc appeared to be sober and did not manifest any confusion or lack of understanding. Carrick further affirmed that he did not make any promises to LeBlanc or use any "tricks or deceit" against him. Although it is evident that LeBlanc was in a state of mental and emotional distress at the time, we conclude that, under the totality of the circumstances, Investigator Carrick's actions plainly did not amount to objectively coercive police activity.

**B. Exclusion of the Defendant's Expert Witness.**
[3] The defense proffered the testimony of Terence Campbell, described as a psychologist with a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

Ph.D. in human development and "a person educated in child interviewing techniques" who could testify regarding the "suggestibility of th[e] questioning techniques [used to question S.S.] as they may have provided [S.S.] with the appropriate answers or inappropriate answers in this matter." The district court held a hearing mid-trial to determine the admissibility of Dr. Campbell's testimony. At the hearing, Dr. Campbell himself offered the following overview of his proffered testimony:

**5 I would testify regarding the appropriateness and related problems involved in the different interview procedures that [S.S.] underwent. I would specifically be talking about how accurately interviewers in fact can recall events from an interview. Moreover, I would be testifying regarding the manner in which the memories of young children the age of [S.S.] can readily become distorted and contaminated because of unintentional inadvertent adult influence.

Dr. Campbell's direct examination at the admissibility hearing was focused almost exclusively upon the existence of a handful of published articles upon which he relied to support his theories. According to Dr. Campbell, those articles focused principally upon two areas: (1) the accuracy of an interviewer's report of an interview with a child, and (2) issues concerning children's memory and suggestibility. On cross-examination, Dr. Campbell admitted that he had not participated in any research relating to the area of his proffered testimony and that none of the studies upon which he relied involved the study of the memory and suggestibility of sexually abused children.

After the hearing, the district court ruled that Dr. Campbell would not be permitted to testify. According to the district court, Dr. Campbell's proposed testimony was deficient because: (1) his theories were not generally accepted in the psychological community; (2) his theories were based on a "soft science" that is "not repeatable" and in which "error is ... rampant"; (3) he had done no research in the area of his testimony; (4) he "[wa]s clearly an advocate"; and (5) the subject of his testimony invaded the province of the jury.

The defendant contends that the district court's exclusion of his proffered expert witness was improper and denied him of a fair trial. We review a district court's evidentiary rulings, including those regarding *399 the admission or exclusion of expert testimony, for abuse of discretion. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Federal Rule of Evidence 702, which governs the testimony of experts, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that Rule 702 places upon trial judges an obligation to ensure "that an expert's testimony rests upon a reliable foundation and is relevant to the task at hand." The Court suggested several factors that trial courts may consider in evaluating the admissibility of expert testimony: (1) whether a theory or technique has been or can be tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique has been accepted by the "relevant scientific community," or "has been able to attract only minimal support within the community." *Id.* at 593–94. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court explained that the "basic gatekeeping obligation" as explained by the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))**

Page 7

Court in *Daubert* applies not just to "scientific" testimony, but to "all expert testimony."

**\*\*6** Of course, the factors suggested in *Daubert* are not to be applied mechanically; rather, district courts are accorded wide latitude in determining the reliability of expert testimony. *See Gross v. Comm'r of Internal Revenue,* 272 F.3d 333, 339 (6th Cir.2001) ("[T]hough helpful, the *Daubert* factors are not dispositive in every case."). Although the district court here did not expressly refer to *Daubert* in evaluating Campbell's proffered testimony, it is clear that the court relied upon at least some of the *Daubert* factors in reaching its decision.

In reviewing the district court's ruling excluding Dr. Campbell's testimony, we conclude that several of the reasons given for exclusion were questionable. Without engaging in extended analysis, we note that the proposed testimony was not subject to exclusion either on the basis that the theories employed by Dr. Campbell have not been generally accepted in the relevant scientific community or because they were based on "soft science" that could not be tested.[FN1]

> FN1. Indeed, a review of a significant body of research on this subject led the New Jersey to Supreme Court to conclude that:
>
> [A] sufficient consensus exists within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events.
>
> *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372, 1379 (N.J.1994). *See id.* at 1384 ("Experts may ... be called to aid the jury by explaining the coercive or suggestive propensities of the interviewing techniques employed."). This conclusion finds support in the legal academic literature. *See* Dana D. Anderson, *Assessing the Reliability of Child Testimony in Sexual Abuse Cases,* 69 S. CAL. L.REV. 2117, 2146 (1996) ("The consensus in the social-science literature indicates that, depending on the procedures used, children can be suggestible, and coercive interviewing techniques can render their accounts of abuse unreliable."); Lisa R. Askowitz & Michael H. Graham, *The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions,* 15 CARDOZO L.REV. 2027 (1994) ("A report published in 1991 by the American Psychological Association, titled The Suggestibility of Children's Recollections ... suggests that adults can manipulate young children into making false accusations."); Diana Younts, *Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions,* 41 DUKE L.J. 691, 697 (1991) ("[C]hilden can be influenced by adults to produce false allegations—either through an adult's misinterpretation of what a child has said, hysteria about the possibility of abuse, or through maliciousness on the part of the adult. Some of the studies examining children's suggestibility have found children to be prone to conforming their stories to the beliefs of the questioning adult.").

The degree of acceptance attained by this theory is borne out in the case law evaluating the admission of expert testimony in this area. As the Supreme Court of Wisconsin observed seven years ago,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))**

"[m]any jurisdictions ... recognize the utility of expert testimony on the suggestive interview technique used with a young child and how suggestive techniques can shape a young child witness's answers." *State v. Kirschbaum,* 195 Wis.2d 11, 535 N.W.2d 462, 466 (Wis.App.1995) (citing cases). The Eighth Circuit has also acknowledged the potential usefulness of such testimony, but has cautioned that experts cannot "opine as to a child witness's credibility." *United States v. Rouse,* 111 F.3d 561, 571 (8th Cir.1997). In sum, the district court's decision to exclude Dr. Campbell's proffered testimony is not properly grounded on a conclusion that his theory lacked "general acceptance."

The district court also appeared to place too much weight on the notion that Dr. Campbell's proffered testimony on child suggestibility was unreliable because it was based upon what the district court called, "soft science." Properly qualified experts in so-called "soft sciences," such as psychology and economics, regularly provide testimony that is helpful to juries in evaluating issues. The commentary to Rule 702 provides that, "[s]ome types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed.R.Evid. 702 advisory committee's note. So long as the proponent of such testimony can demonstrate that it is relevant and reliable, it should not be excluded on that basis.

*400 [4][5][6] Nevertheless, although Dr. Campbell's testimony regarding child suggestibility did suffer from at least one serious flaw that justified keeping it from the jury. Obviously, expert testimony is subject to the same relevancy constraints as all other kinds of evidence. *See* Fed.R.Evid. 402. Rule 702 requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." The question of relevance, or "fit," is a preliminary question for the trial judge. The proponent of expert testimony must establish its admissibility by a preponderance of proof. *See Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 251 (6th Cir.2001). This preliminary showing that the proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," is a necessary precondition to admissibility. *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985) (cited in *Daubert,* 509 U.S. at 591). *See also State v. Sargent,* 144 N.H. 103, 738 A.2d 351, 354 (N.H.1999) (holding that proper interview techniques used to interview child sexual abuse victims is appropriate subject of expert testimony, but that "*[t]here must be a particularized showing that improper interview techniques were used ... before a party can introduce expert testimony*" (emphasis added)).

Here, as the government notes, LeBlanc failed entirely to demonstrate the "fit" between Dr. Campbell's proffered testimony and any fact at issue in this case. At no *401 time during the *Daubert* hearing did Campbell point to a single instance in which S.S. was supposedly subjected to allegedly coercive or suggestive questioning techniques. This is so in spite of the fact that the defense had every opportunity to cross-examine the police investigator who initially interviewed S.S., as well as the social worker who conducted her direct examination.[FN2] In addition, although Dr. Campbell stated that he also wished to provide testimony regarding the accuracy of an *interviewer's* report of an interview with a child, the government did not introduce any evidence of interviews with S.S. through an inter-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.)))

viewer-witness. Finally, it is clear from the child's testimony at trial that she was able to recount what occurred on the evening in question without undue prompting.

> FN2. Dr. Campbell stated at the hearing, "Of course, I don't know exactly how [S.S.] was interviewed, for example, on June 6; and I don't know exactly how she was interviewed by Ms. Waters on October 9, October 10, and October 16. And the problem is no one else knows either."

**\*\*7** At the outset of its remarks at the close of the hearing, the district court observed that "[t]here appears to be nothing by way of proffer to indicate that in fact the specific evidence in this case is to be given an opinion concerning." We agree and observe that without any showing whatsoever that improper techniques were used with *this witness,* Dr. Campbell's testimony would have presented the jury with an abstract theory having the potential to presumptively malign the testimony of S.S. as a product of coercion in the absence of any evidence that such was the case. The fact that LeBlanc failed to lay an adequate foundation for Dr. Cambpell's testimony is a sufficient basis on which to conclude that the district court did not abuse its discretion in excluding him. It is therefore unnecessary to evaluate in detail the district court's remaining problems with the proffered testimony. However, a review of the transcript shows that the defense's abbreviated effort to establish Dr. Campbell's expertise in this area was less than compelling, and it is not surprising that the district court was not convinced that Dr. Campbell's opinions were adequately supported by his expertise.

Finally, it should be noted that, even if the defense had been able to lay an adequate foundation and the exclusion of Dr. Campbell did amount to error, the error would have to be considered harmless, given the powerful evidence of LeBlanc's guilt—specifically, LeBlanc's out-of-court confessions—that was wholly unrelated to the *child's* recollection of the incident.

### III. *CONCLUSION*

The district court did not commit plain error in failing to suppress, *sua sponte,* LeBlanc's inculpatory statements to law enforcement officers. Contrary to the defendant's argument on appeal, the evidence does not show that the confessions resulted from objectively coercive police conduct. In addition, the district court did not abuse its discretion in excluding the defendant's proffered expert testimony regarding coercive or suggestive interviewing techniques, given that the defense failed to make a foundational showing of the relevance of such testimony to this case. Accordingly, we **AFFIRM** the judgment of the district court.

C.A.6 (Mich.),2002.
U.S. v. LeBlanc
45 Fed.Appx. 393, 2002 WL 2026182 (C.A.6 (Mich.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

B

# Bill McGregor
Digital Forensic Specialist
Email: bill@einvestigations.com

## KEY COMPETENCIES
-Forensically image storage on digital devices including computers, mobile devices, and video devices
-Extensive data analysis and data consulting using a wide variety of forensic tools
-Installation/Configuration/Administration of Windows, Linux, OSX
-Support/configure a wide variety of database, application, and network devices

## PROFESSIONAL EXPERIENCE
**APR 2011 to PRESENT, 40+ Hours/Week**
**FORENSIC SPECIALIST - E-INVESTIGATIONS    HOUSTON, TX**
- Image storage devices with forensically sound tools
- Advanced Data Analysis and Data Consulting
- Perform advanced network security sweep, intrusion prevention
- Install class leading managed network protection

**MAY 2006 to NOV 2009, 80+ Hours/Week**
**DEVELOP/SUPPORT/TRAINING/ANALYSIS/LEAD – SAIC / CSC    Baghdad, IRAQ – Secret Clearance**
- Software development, testing, training, support
- Lead System Administrator for multiple sites throughout Iraq
- Data Analysis for multi-billion in military purchases
- Run and maintain server systems that process biometric data

**FEB 2005 to APR 2006, 40 Hours/Week**
**TELECOMMUNICATIONS TECHNICIAN - DOD USAF, STRATCOM– Top Secret Clearance**
- Monitors and controls performance of networks and Communications/Computer Systems
- Tests subscriber equipment, end-to-end circuits, systems, and networks to verify services
- Configures systems and networks based on requirements, network traffic patterns, and loading

**DEC 1996 to NOV 2004, 40+ Hours/Week**
**EWS TECH / COMPUTER SUPERVISOR - USAF / US STRATCOM – Top Secret Clearance**
-Supports the President, Secretary of Defense, CJCS, CDRSTRAT, and CDRNORAD
-Supervise personnel in the Alternate Missile Warning Center (AMWC) valued at $45 million
-Monitors system configuration, alert messages and facility environmental conditions
-Coordinates with analysts concerning resource capability, operations, reports, system problems

## COURSES & PROFESSIONAL DEVELOPMENT
-Completing Masters in Management Information Systems (MSMIS)/Minor in Digital Forensics
-B.S. Degree Internet System Software Technology (ISST), Bellevue University
-A.S. Degree Information Systems Technology (3C0), CCAF
-ENCE Training course 1 & 2
-Licensed private investigator
-Network Security (University)
-Database Design and Security (University)
-Systems Analysis and Design (University)
-Information Security Management (University)
-Computer Forensics (University)
-Security and Information Warfare (University)
-3C0X1 Comm. Systems Operator training (Air Force School)
-2A031A Electronic Principles (Air Force School)