Vol. 12:   1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

```
UNITED STATES OF AMERICA        .  CRIMINAL ACTION NO.
                                .  4:14-CR-023-A-1
V.                              .
                                .  Fort Worth, Texas
CHRISTOPHER ROBERT WEAST         .  July 28, 2014
. . . . . . . . . . . . . . . . .
```

VOLUME 12 OF 16
TRANSCRIPT OF THE TRIAL
(Morning Session)
BEFORE THE HONORABLE JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE, WITH A JURY.

APPEARANCES:

For the Government:              MS. AISHA SALEEM
                                 MR. DANIEL P. COLE
                                 United States Attorney's Office
                                 801 Cherry Street, Suite 1700
                                 Fort Worth, Texas   76102-6897
                                 (817) 252-5200

For the Defendant:               MS. ANGELA R. SAAD
                                 MR. CHRISTOPHER A. CURTIS
                                 Federal Public Defender
                                 819 Taylor Street, Room 9A10
                                 Fort Worth, Texas   76102
                                 (817) 978-2753

Court Reporter:                  MS. ANA P. WARREN
                                 U.S. District Court Reporter
                                 501 W. 10th Street, Room 502
                                 Fort Worth, Texas   76102-3637
                                 (817) 850-6681

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

Vol. 12:  2

# *P R O C E E D I N G S*

1

2        (Jury sworn by the clerk)

3            THE COURT:  Okay.  You can be seated.

4        I'm going to give you some instructions now that will be

5    particularly applicable during the actual trial.  At the

6    conclusion of the evidence and after the lawyers have made

7    their final statements, at that time I'll give you some more

8    detailed instructions that will explain what the law is

9    applicable to the case and exactly what the government was

10    obligated to prove beyond a reasonable doubt to cause the

11    defendant to be convicted.  But these instructions I'm giving

12    you now are important, so listen closely to them.

13        It will be your duty to find from the evidence what the

14    facts are.  You and you alone are the judges of the facts.

15    You will then have to apply those facts to the law as the

16    Court will explain it to you -- as we go along at the end of

17    the case, I'll give you the more detailed instructions -- and

18    the jury is obligated to follow the law whether they agree

19    with it or not.

20        Now, nothing the Court says during the course of the trial

21    is intended to indicate nor should it be taken by you as

22    indicating what I think your verdict should be.  The evidence

23    from which you will find the facts will consist of the

24    testimony of witnesses, documents, and other things received

25    into the record and exhibits, and any facts the lawyers might

1    agree on or stipulate to if that were to be the case.

2        Now, certain things are not evidence, and you must not

3    consider these things as evidence at all, such things as

4    statements, arguments, and questions by lawyers.  Objections

5    to questions are not evidence.  Lawyers have an obligation to

6    their client to make an objection when they believe evidence

7    being offered is improper under the rules of evidence.

8        The jury should not be influenced by the objection or by

9    the ruling the Court makes on an objection.  If an objection

10   is sustained, ignore the question.  If the objection is

11   overruled, treat the answer like any other answer.

12       Now, testimony the Court has excluded, if somebody

13   testifies to something or if exhibits are received and I'm

14   persuaded it should not have been, then I may ask you not to

15   consider it, and, of course, you'll follow whatever

16   instructions the Court gives along that line.

17       Anything you may have seen or heard outside the courtroom

18   is not evidence and must be disregarded.  The case is to be

19   decided solely on the evidence presented and received during

20   the trial here in the courtroom.

21       Now, as I've already explained, the defendant is not

22   present in the courtroom, and you're not to speculate why he

23   is not present or should you even discuss that matter amongst

24   yourselves.  He will be represented throughout the trial by

25   his attorneys.  His absence from the courtroom has no

Vol. 12:   4

1    relevance to any decision the jury is to make in this case and

2    has no bearing on whether the government satisfies or has

3    satisfied its burden to establish beyond a reasonable doubt

4    the defendant's guilt of one or both of the offenses charged

5    by the defendant by the third superseding indictment in this

6    case.   Therefore, you are not to consider the defendant's

7    absence from the courtroom for any purpose either for or

8    against the defendant during your deliberations.

9        As I inform the panel from which you were selected, the

10   defendant will be able to see through closed circuit video the

11   witnesses who testify in this case as they testify and to hear

12   the things that are said in the courtroom to a remote sound

13   system, and if the defendant wishes to communicate with his

14   attorneys during the trial, he has the ability to do so

15   through wireless internet computer arrangement that has been

16   provided.

17       Now, if a witness is called upon to identify the defendant

18   as the first person the witness is testifying about, the Court

19   will allow the witness to make the identification by means of

20   a photograph of the defendant, thus, eliminating the need for

21   the defendant to be in the courtroom when the identification

22   is made.

23       Now, there are two kinds of evidence, direct evidence and

24   circumstantial evidence.   Direct evidence is direct proof of a

25   fact, such as testimony of an eyewitness.   Circumstantial

1    evidence is proof of facts from which you may infer or

2    conclude that some other fact exists.  A simple example I give

3    of that, if you were to go to bed at night and there was no

4    snow on the ground, and if you woke up in the morning and the

5    ground was covered with snow, even though you didn't see it

6    snow, you would have circumstantial evidence that it snowed

7    during the night.

8        And I'll give you some further instructions on those as

9    well as other matters at the end of the case, but bear in mind

10   that you can consider both kinds of evidence, circumstantial

11   evidence as well as direct evidence.

12       Now, it will be up to the jury to decide which witnesses

13   to believe, which witnesses not to believe, or how much of any

14   witness's testimony to accept or reject, and I'll give you

15   some guidelines for determining the credibility of witnesses

16   at the end of the case.

17       Now, I've already gone over some basic rules, but I'm

18   going to go over them again because they are very important.

19       Three basic rules about a criminal case that you must keep

20   in mind.  First, the defendant is presumed innocent until

21   proven guilty.  The indictment against the defendant brought

22   by the government is only an accusation and it's nothing more.

23   It is not proof of guilt or anything else.  The defendant,

24   therefore, starts out with a clean slate.

25       Second, the burden of proof is on the government until the

1    very end of the case.  The defendant has no burden to prove

2    his innocence or to present any evidence or to testify.  Since

3    the defendant has the right to remain silent, the law

4    prohibits the jury in arriving at its verdict from considering

5    that the defendant may not have testified.

6        The government must prove the defendant's guilt beyond a

7    reasonable doubt.  I'll give you some further instructions on

8    that at a later time, but bear in mind -- and I've already

9    given some, but bear in mind, that in that respect, a civil

10   case is different from a -- a criminal case is different from

11   a civil case.

12       Now, during the trial, before you start your

13   deliberations, you're not to discuss the case with anyone or

14   permit anyone to discuss the case with you.  That includes

15   even each other.  We found that when jurors start discussing

16   the case with each other, they tend to start making judgments

17   about the case, and we don't want anybody to form judgments

18   until all the evidence is in and the lawyers have had an

19   opportunity to make their final statements and you've heard

20   the instructions on the law and start your deliberations.

21   That's when you start making judgments, and that's the reason

22   we prohibit you from discussing the case even amongst

23   yourselves before you start your deliberations.

24       Obviously, you don't discuss the case with other people

25   because we don't want anybody else trying to tell you what

1    they think the outcome ought to be, and it's very important

2    that you not let anybody discuss it with you.

3        When you first go back to the jury room, you will receive

4    a badge that identifies you as a juror.  Wear that badge at

5    all times when you're in and around the courthouse so

6    everybody will know you're on the jury.  All of the witnesses

7    who will testify in this case came into the courtroom before

8    you did this morning.  I swore them all as witnesses.  You

9    won't see me administer the oath to any of the witnesses

10   because they have already been sworn, but they are all

11   testifying under oath.  And those people are in and around the

12   courthouse, and if they don't see you with a jury badge on,

13   they may want to tell you what they know about the case, or

14   something like that, or what they think about it, and that

15   would be highly inappropriate.  So we want to make sure

16   everybody knows you're on the jury so there won't be any

17   accidental communication.

18       Don't read anything about the case, and if anybody should

19   try to talk to you about it, bring that to my attention

20   promptly immediately.  Don't try to make any investigation on

21   the case on your own.  That would be highly inappropriate.

22   And that includes such things as looking words up in the

23   dictionary.  That's an investigation.  That would be

24   inappropriate.  It would include trying to get information off

25   the internet.  Jurors would try to do that from time to time,

1   and when it comes to the attention of the Court, they have had

2   to start the trials all over again.

3       And don't put anything on the internet about the case.

4   Don't even put on the internet that you're participating in

5   the case.  I don't think any of you have facilities to do that

6   with you in the courtroom or here at the courthouse, but if

7   this were to happen to go over until tomorrow, you would need

8   to be very careful not to use any social network or anything

9   else that would have any information conveyed by you about the

10  case or where you would seek any information about the case.

11  You need to be very careful about that.

12      Now, as far as the lawyers are concerned, you may run

13  into -- or other people connected with the case, witnesses or

14  whatever, you may run into them in the hallway or on the

15  elevator.  I'm instructing you not to have any communication

16  with them even passing the time of day, saying hello,

17  whatever, because that can be construed to be something that

18  it's not.  So we don't even want to have the appearance of

19  impropriety.

20      If you were to happen to get on the elevator with someone

21  connected on the case, just make out like they are not there,

22  and they will know to make out like you're not there because

23  they know what the rules are as well as you do.  It's

24  important that you not form any opinions about the case until

25  all the evidence is in, you've heard the final statements, and

1   heard the legal instructions.  In other words, keep an open

2   mind until you start your deliberations at the end of the

3   case.  I don't permit the taking of notes during the trial

4   because I find that -- I've got more than one reason for that,

5   but I find that note taking can be distracting, not only to

6   the person taking the notes, but the person around the note

7   taker.  So we avoid that.

8       Now, from time to time during the trial, it may be

9   necessary for me to confer with the lawyers on matters that

10  are not a concern to the jury, legal matters.  If we can have

11  those conferences up here with me turning the microphone off,

12  that's the way we will do it to save time, but if it

13  requires -- if it's something that's going to take a period of

14  time, I'll have the lawyers -- I'll have you go back to the

15  jury room while I confer in court with the lawyers, but I

16  think we'll avoid that.

17      During the trial, I may be called upon to rule on motions

18  or objections made by lawyers, and you should not infer from

19  any ruling I make that I have any opinion on the merits of the

20  case favoring one side or the other.

21      Now, the trial is getting ready to begin, and I'm going to

22  give you the sequence of events that will occur during the

23  course of the trial.

24      The very first thing is the government will read the third

25  superseding indictment through one of its attorneys.  A plea

Vol. 12:   10

1    of not guilty has been entered for the defendant, and that

2    will continue to be the plea.  So you will know exactly what

3    he's charged with.  That will be how we start the trial.  The

4    government's attorney will read the third superseding

5    indictment.

6        And then I give each side an opportunity to make an

7    opening statement, and that opening statement is limited to

8    five minutes her side.  It's not argumentative in any respect.

9    The lawyers know they're not suppose to make arguments at that

10   point in time.  It's simply a dispassionate statement of what

11   the lawyer expects the evidence to prove from his or her

12   client's standpoint during the course of the trial.

13       The defendant does not need to make his opening statement

14   to begin with if he wants to through his attorney or

15   attorneys.  He can inform the Court that he will reserve the

16   right to make his opening statement after the government has

17   put on the government's case.

18       The government always goes first at each step of the case

19   because it has the burden of proof.  So it's necessary that

20   they always go first.  Then after the government puts on the

21   government's case, if the defendant wants to wait until then

22   to make an opening statement, his attorney can inform the

23   Court of that fact, and the defendant can do that assuming the

24   defendant proposes to offer evidence.

25       After the opening statements have been made, then that

Vol. 12:  11

1    gives the attorney for the government an opportunity to put on

2    the government's case, and that will include witnesses and

3    exhibits.  After a witness has been questioned, a witness has

4    been questioned by the attorney for the government, then that,

5    of course, as you know, gives the defendant's attorney an

6    opportunity to cross examine the witness.

7        What may not be apparent from your prior experience in

8    court proceedings is in federal court the cross examination is

9    limited to the subjects that were covered on the direct

10   examination and questions about the credibility of the witness

11   if any questions like that exist.  So if you hear the

12   statement made that it exceeds the scope of the direct

13   examination or is beyond the scope of direct examination,

14   that's what that refers to.  Somebody has taken the position

15   that the cross examiner has gone too far.  I don't think that

16   will happen in this case because I think these lawyers know

17   what the rules are and will follow the rules, but that is one

18   of the rules.

19       We have other rules that we follow.  For example, when

20   cross examination starts or when the cross examiner asks

21   questions, the cross examiner doesn't repeat what the witness

22   said on direct examination, such as, when you testified

23   earlier, you said so and so.  We don't repeat what the witness

24   has already said.  They simply ask questions.

25       And they don't ask the same question two or three

 1    different ways.  Sometimes you see over TV lawyers question

 2    witnesses, and they'll ask a question.  They'll get an answer,

 3    and then they'll ask it a different way to get the answer

 4    again, I guess because they like the answer.  We don't do that

 5    here.  Once a question is asked and answered, we go on to

 6    something else.  It would be improper to ask the question

 7    again in a different way.

 8         After the government has completed its questioning, after

 9    the government has put on its evidence, its attorney will

10    announce that it rests, and then after that occurs, the

11    defendant has an opportunity, if the defendant wants to offer

12    any evidence, to offer evidence.  It doesn't have any

13    obligation to.  And if the defendant reserves the right to

14    make an opening statement at that time, that's when the

15    defendant would make that opening statement, the attorney for

16    the defendant, and proceed with whatever evidence the

17    defendant chooses to offer.

18         The same rules apply as far as cross examination is

19    concerned.  Once the defendant puts on a witness, if the

20    defendant does, then the attorney for the government has a

21    right to cross examine that witness and the same rules of

22    limitations apply.

23         After the defendant offers the defendant's evidence, if

24    any, then the government has an opportunity to have rebuttal

25    evidence that would answer things the defendant has offered

Vol. 12:  13

1    into evidence.  That usually doesn't take long, if it occurs.

2    And then after that occurs, I give each side a few minutes to

3    make a closing statement.  Actually, at that point in time it

4    is an argument because the lawyers are reasoning with you as

5    to why the lawyer thinks the evidence establishes what the

6    lawyer is trying to prove.  So in a sense, they're making

7    closing arguments, and that's usually limited to no more than

8    ten minutes per side.  And then after that occurs, then I'll

9    give you the legal instructions that apply and will help you

10   decide -- well, they will be the instructions that will govern

11   your actual decision.

12      Okay.  At this time if you would read the indictment,

13   third superseding indictment.

14      MS. SALEEM:  Third superseding indictment.  Count 1,

15   possession of child pornography, a violation of 18, USC,

16   Section 2252A(a)(5)B) and 2252A(b)(2).

17      On or about July 10, 2012, in the Fort Worth Division of

18   the Northern District of Texas, defendant, Christopher Robert

19   Weast, did knowingly possess material that contains an image

20   of child pornography that was produced using materials that

21   had been mailed, shipped, and transported, in and affecting

22   interstate and foreign commerce by any means including by

23   computer.  Specifically, Weast possessed a Western Digital

24   external hard drive, Serial Number WCAV5C309672, containing

25   the following described file depicting child pornography, as

Vol. 12:   14

1   defined in 18, USC, Section 2256(8)(A).

2       File path: C\Practice\Pics\!10yo_tied_to_2chairs010-1.jpg.

3       Description of the image:  Still image depicting a nude

4   minor female gagged and tied by her legs to two chairs.

5       C\Practice\Pics\(pthc)tori9yo-My Younger Sister-18.jpg.

6       Still image depicting a nude minor female lying on a bed

7   with one leg lifted to expose her genital area.

8       C\Practice\Pics\(pthc)tori9yo-my_younger_sister-36.jpg.

9       Still image depicting a nude minor female lying on a bed

10  with her legs spread apart to expose her genital area.

11      C\Practice\Pics\((lolitaguy))sandra-teen model nude-beach

12  lolita preteen underage 12yo 11yo 13yo 14yo 10yo 9yo 8yo 7yo

13  6yo.jpg.

14      Still image depicting a nude minor female lying on a bed

15  with her legs spread apart and one of her fingers touching her

16  genital area.

17      C\Practice\Pics\!!pthc lsm magazine 9yo kidzilla pre-teen

18  young little girls harry potter jenny-img20041009171217.jpg.

19      Still image depicting a seated prepubescent female nude

20  from the waist down with legs bent to expose her genital area.

21      C\Practice\Pics\Lucifer's Collection-9Yo Jenny Tied Nude

22  With Legs Spread Wide Apart Showing 'Open Pussy-Lucifer's

23  Underage Lolita R@YgoldPthc Ptsc Ddogprn Pedo Young C.jpg.

24      Still image depicting a mostly nude minor female lying on

25  her bed with her hands tied with yellow rope above her head

Vol. 12:   15

1    and her legs spread apart and tied with yellow rope.

2        In violation of 18, USC, Section 2252A(a)(5)(B) and

3    2252A(b)(2).

4        Count 2, receipt of child pornography, a violation of 18,

5    USC, Section 2252A(a)(2)(A) and 2252A(b)(1).

6        On or about June 28, 2012, in the Fort Worth Division of

7    the Northern District of Texas, defendant, Christopher Robert

8    Weast, did knowingly receive child pornography that was

9    shipped and transported in and affecting interstate and

10   foreign commerce by any names including by computer.

11   Specifically, Weast received the following described file

12   depicting child pornography, as defined in 18, USC,

13   Section 2256(8)(A).

14       File name:  !!!!Pthc Donna 9Yo Kinderkutje Pedo Babyj

15   R@Ygold Rides Cock Mpeg.avi.

16       Description of file:  A video of a nude minor female who

17   was wearing a hood and engaged in sexual intercourse with an

18   adult male, in violation of 18, USC, Section 2252A(a)(2)(A)

19   and 2252A(b)(1).

20           THE COURT:  Okay.  The defendant -- a plea of not

21   guilty has been entered for the defendant, and it will

22   continue to be a plea of not guilty as to the offenses charged

23   against him by the third superseding indictment.

24       Okay.  Do you have an opening statement you would like to

25   make?

Vol. 12:  16

1          MS. SALEEM:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. SALEEM:  I anticipate that the evidence that

4    you're going to hear today is that Fort Worth police officer

5    Randy Watkins was engaged in an undercover internet crimes

6    against children activity.  In doing so, he used file sharing

7    software to see what other individuals are also sharing child

8    pornography.  I anticipate that Officer Watkins will tell you

9    that he connected to an IP address in White Settlement, Texas,

10   that he downloaded approximately six images back on June 4 of

11   2012 of what he considered to be child pornography.

12       You will hear evidence that after that, Officer Watkins

13   then obtained a location of where that IP address was, that he

14   then executed a search warrant at that location.  You will

15   hear from Officer Watkins that he then seized a number of

16   computer devices from that residence, including from

17   Mr. Weast, the defendant's bedroom, which has blue walls.

18       I anticipate that you will hear that after a forensic

19   examination was conducted, that there were a number of child

20   pornography images that have been described in the indictment

21   in Count 1 that were found on Mr. Weast's Western Digital

22   external drive.

23       I also anticipate that you will hear from the forensic

24   examiner that he found evidence of file sharing software on

25   the laptop that was used to download child pornography.

Vol. 12:   17

1    And then I also anticipate that you will hear from the

2    forensic examiner that in that file sharing software, there

3    was evidence that Mr. Weast had received the file that's been

4    listed in Count 2.

5    I anticipate, ladies and gentlemen, after you hear all of

6    the testimony today, that you will -- that we will ask you to

7    return a guilty verdict.  Thank you.

8         THE COURT:  Okay.  Does the defendant wish to make an

9    opening statement at this time?

10        MS. SAAD:  Yes, Your Honor.

11        THE COURT:  Okay.  You may proceed.

12        MS. SAAD:  Child pornography, the government will be

13   introducing images of what they allege is child pornography --

14        THE COURT:  Now, remember this is not the time to

15   make arguments or statements.  It's the time to

16   dispassionately state to the jury what the parties expect the

17   evidence to prove, and if it goes beyond that, then the

18   practice is that the attorney will be asked to be seated.

19   You may proceed.

20        MS. SAAD:  Yes, Your Honor.

21   Ladies and gentlemen, you will hear from the forensic

22   examiner of the government.  The forensic examiner provided a

23   report.  No where in that report will the evidence show all of

24   the viruses found on this computer.  There were over ten

25   viruses, all of which the forensic examiner provided to us on

1    July 23, a list of those viruses.

2        No where in this report does this forensic examiner

3    acknowledge that these viruses made his computer vulnerable to

4    exploitations, exploitations like hacking and remote access.

5        The evidence will show that the government will not be

6    able to prove that Mr. Weast knowingly possessed child

7    pornography.  The government must -- the government will be

8    unable to show that it is child pornography --

9            THE COURT:  Why don't we stick to what you expect the

10   evidence to prove.

11           MS. SAAD:  Yes, Your Honor.

12       The evidence will show the government never seized the

13   wireless router, the wireless router that made the computer

14   vulnerable to these types of viruses.

15       The evidence will show that the images have data that

16   shows where they came from, whether it came from a camera,

17   whether it came from photo shop, whether it came from -- it

18   was edited from other types of software.  No where in this

19   forensic examiner's report does it document this.  Not until

20   last week did the defendant receive the information --

21           THE COURT:  I think we're going beyond what you

22   expect the evidence to prove.  I don't think you're going to

23   have evidence of what happened last week.  Let's proceed.

24           MS. SAAD:  Yes, Your Honor.

25           THE COURT:  Let's stick with what the rules

Vol. 12:   19

1    authorize, and the rules authorize you to make a statement as

2    to what you expect the evidence to prove.  You may proceed.

3            MS. SAAD:  The evidence will prove that the

4    government will not be able to show where these files came

5    from definitively.  The evidence will show that some of these

6    files were edited.

7        The government has to prove that it's an actual or real

8    child.  The government must show that Mr. Weast --

9            THE COURT:  You're not talking about what the

10   evidence will show.  You want to argue the law.  Let's talk

11   about what the evidence will show, and if you can't confine it

12   to that, then I will have to ask you to be seated.

13           MS. SAAD:  Mr. Weast -- there is no evidence that

14   Mr. Weast was the person who viewed this child pornography,

15   that he knowingly possessed this child pornography, and based

16   on the times and the types of files, this will show that he

17   never possessed them.  He never viewed them, and based on all

18   of this evidence, acknowledging that these are offensive and

19   disgusting evidence, Mr. Weast did not knowingly possess these

20   images, and the government cannot prove this beyond a

21   reasonable doubt.

22       Thank you, ladies and gentlemen.

23           THE COURT:  Okay.  Call your first witness.

24           MS. SALEEM:  I call Randy Watkins.

25           THE COURT:  You may proceed.

1    RANDY WATKINS, testified under oath as follows:

2                    **DIRECT EXAMINATION**

3    BY MS. SALEEM:

4    Q.  Can you please state your name and what you do for a

5    living?

6    A.  Randy D. Watkins, and I'm a detective with the Fort Worth

7    Police Department.

8    Q.  Where are you currently assigned?

9    A.  I'm currently assigned in the homicide unit.

10   Q.  Back in 2012, where were you assigned?

11   A.  I was assigned in the Crimes Against Children Unit at that

12   time.

13   Q.  What type of cases did you work in the Crimes Against

14   Children Unit?

15   A.  I worked child exploitation cases, mainly, child

16   pornography and what's in the states called Online

17   Solicitation of a Minor.

18   Q.  Can you describe what your training and what your

19   background was with respect to your child pornography

20   investigation?

21   A.  I've been to numerous schools.  I've worked those types of

22   cases since around 2002, numerous schools all over the

23   country, getting different techniques, software programs, and

24   the newest trends on what was being done.

25   Q.  Now, let me direct your attention back specifically to

Vol. 12:   21

1   June 4, 2012.  Were you working in that capacity?

2   A.  Yes.

3   Q.  Did you engage in any undercover online investigations

4   around that date?

5   A.  I did.

6   Q.  Can you describe that investigation as it relates to the

7   indictment charged against Mr. Weast?

8          MR. CURTIS:  Your Honor, I'll object at this time

9   based on our previous filed motion to suppress.  I want to

10  reurge that based on the testimony that this witness --

11         THE COURT:  The objection is overruled.

12         MR. CURTIS:  Thank you, Your Honor.

13  A.  Could you repeat the question again?  I'm sorry.

14  BY MS. SALEEM:

15  Q.  Sure.  Can you describe your undercover online

16  investigation as it relates to Mr. Weast back on June 4,

17  2012?

18  A.  Yes.  I was investigating the promotion of child

19  pornography.  Again, I'm talking the state term, offenses,

20  basically, people sharing child pornography on the internet.

21  I had been to school under Operation Fair Play, which is an

22  FBI operation.  I went to a school in Boca Raton, Florida

23  where I received training and the software, which allowed me

24  to make it simple to engage in peer-to-peer file sharing if

25  the software showed who or what IP address was sharing known

Vol. 12:   22

1    child pornography in this geographic area.  I also had

2    software, once that IP address was located, that actually

3    tried to connect to that IP address and download what was

4    offering to be shared.

5    Q.   Now, you mentioned -- or can you describe what you mean by

6    peer-to-peer sharing, the software that you had?

7    A.   Peer-to-peer file sharing is done on the internet, and

8    it's, basically, people that have common interests are able to

9    connect to each other using this software, the peer-to-peer

10   file sharing software, which is available to anyone to

11   download.  Once they have it downloaded, they share whatever

12   they choose in a shared folder and allow anyone to have access

13   to those items.

14   Q.   In this particular case, what type of file sharing program

15   did you have?

16   A.   I had what's called the Child Protection System, and,

17   again, that was the software that I received in Florida.  That

18   showed me who in this area was making child pornography

19   available, and that was based on the FBI database that was

20   comparing these images offered to be shared to their database

21   using a digital fingerprint, the Shaw value, and that's how

22   they knew it was child pornography, because somebody had

23   looked at it in the past, and it was placed in the database.

24   So this database I had pulled up this IP address, showed this

25   IP is sharing known child pornography.

1    MR. CURTIS:  I object, Your Honor, to any testimony

2  that the shared file folder in question was sharing known

3  child pornography.  I think that calls for speculation --

4    THE COURT:  I'll overrule the objection.

5    MR. CURTIS:  -- and improper opinion, Your Honor.

6    THE COURT:  I'll overrule the objection.

7  A.  Once this IP address was identified, I, again used this

8  other software called Shareaza LE, which was specifically for

9  law enforcement, which then I put that IP address in this

10  other software, and it tried to connect with that IP address

11  to download what they were offering to share.

12    Once that was downloaded by the Shareaza LE software, it

13  made its own folder on my computer.  It doesn't re-share it.

14  It doesn't have the capability.  It makes its own folder.

15  Then I go into it and review what was downloaded to look at

16  and make sure that what was downloaded was what it said it was

17  to see if it was child pornography or not.

18  BY MS. SALEEM:

19  Q.  And is that what you did back on June 4, 2012?

20  A.  Yes.

21  Q.  Were you able to -- do you actually select an IP address

22  that you want to download child pornography from?

23  A.  Yes.  The software, the Child Protection Software,

24  identifies it may be several.  It may be ten.  It may be 12 IP

25  addresses.  It even lets me select the Fort Worth area.  I

Vol. 12:   24

1    could expand it to the Tarrant County area.  I keep it to the

2    Fort Worth area.

3        Then I will usually put several -- because it will also --

4    this Child Protection Software also shows how many images or

5    movies that that IP is trying to share.  So based on that, I

6    would pick the ones with the most and put those into the

7    Shareaza LE software and try to make connections with those to

8    see what it would download.

9    Q.  And this separate software, the Shareaza LE, how is that

10   different from regular file sharing software of other

11   individuals?

12   A.  It's different in that anyone in the public can download

13   Shareaza, which is a file sharing software.  The difference is

14   the Shareaza LE, once it downloads -- it's specifically for

15   law enforcement, and once it downloads, it doesn't re-share.

16   It makes its folder and creates its own folders of what it

17   downloads.  Shareaza, the other file sharing software, will

18   allow you to make your shared folder and re-share whatever you

19   choose to share with others.

20   Q.  Now, back on June 4 of 2012, were you able to connect to

21   an IP address that you ultimately connected to Mr. Weast?

22   A.  Yes.

23       MR. CURTIS:  I'm going to object to that, Your Honor,

24   as calling for hearsay and speculation.

25       THE COURT:  I'll overrule the objection.

1    A.  Yes.

2    BY MS. SALEEM:

3    Q.  How many files on that day did you download from that IP

4    address?

5    A.  On --

6    Q.  On June 4.

7    A.  On June 4, I believe there were six files downloaded on

8    June 4.

9    Q.  What did you do after that?

10        MR. CURTIS:  I'm also going to object to 404(b) and

11   403, Your Honor, as being more prejudicial than probative.

12        THE COURT:  I'll overrule the objection.  This

13   evidence is highly probative, and it's probativeness overcomes

14   any potential prejudice.

15   BY MS. SALEEM:

16   Q.  What did you do after you downloaded those two files?

17   A.  After the files were downloaded, again, like I said, I

18   looked at the files to make sure that they were, in fact,

19   child pornography, and they were --

20        MR. CURTIS:  Again, I object to that conclusion, Your

21   Honor.  It calls for an improper opinion that he doesn't --

22        THE COURT:  I'll overrule that objection.

23        MR. CURTIS:  -- have the expertise or has been

24   identified.

25        THE COURT:  I'll overrule that objection.

Vol. 12:  26

1    A.  And based on my training and experience and looking at the

2    images for almost ten years, that's what I believed to be

3    child pornography.

4        Also, when I was checking the Shareaza logs, I noticed in

5    the file logs down at the bottom, it also said that the

6    computer nickname that it was downloaded from was named

7    Chris.

8            MR. CURTIS:  I object, again, to the -- that calls

9    for speculation and improper opinion, Your Honor.

10           THE COURT:  Overruled.

11   BY MS. SALEEM:

12   Q.  Then what did you do?

13   A.  Okay.  Then I prepared a grand jury subpoena and sent it

14   to the Tarrant County District Attorney's Office to be

15   processed, and the information I was looking for was what --

16   well, first, what I did was using the program -- it's just on

17   the internet.  You can go to centralops.net, and I typed in

18   this internet protocol, or IP address, the one it was

19   downloaded from, to find out what internet provider owns that

20   IP address, and in this case it showed SBC.  So I used that

21   information to prepare the grand jury subpoena to the Tarrant

22   County District Attorney's Office and sent them a request for

23   a grand jury subpoena asking for the account holder

24   information on that IP address.

25   Q.  And did you receive that information?

Vol. 12:  27

1    A.  Yes --

2           MR. CURTIS:  Your Honor, I renew my objection on the

3    motion to providing that information -- I renew my previous

4    motion to suppress on the information gained by the

5    subpoena.

6           THE COURT:  I'll overrule the objection.

7        You may proceed.

8           MS. SALEEM:  Thank you, Your Honor.

9    BY MS. SALEEM:

10   Q.  I'm sorry.  Did you answer the question with respect to --

11   A.  I did receive the information from SBC through the Tarrant

12   County District Attorney's Office on June the 20th.

13   Q.  I'm going to ask you to look at the notebook that's to

14   your left and have you look at Government's Exhibit Number 69.

15   Do you recognize Government's Exhibit 69?

16   A.  Yes, I do.

17   Q.  What is that just generally speaking?

18          MR. CURTIS:  Your Honor, I object to 69 as hearsay,

19   and I also renew my motion to suppress that's been previously

20   overruled.

21          THE COURT:  What is the purpose in offering that

22   exhibit?

23          MS. SALEEM:  I'm actually not offering it at this

24   time.  I'm just asking if that's the same information that he

25   acted on --

 1          THE COURT:  Oh, okay.  I overrule the objection.

 2      Is that the information you acted on, what's shown in

 3  Exhibit 69?

 4          THE WITNESS:  Yes, Your Honor.

 5          THE COURT:  Okay.  Go ahead.

 6  BY MS. SALEEM:

 7  Q.  What did you do once you received the contents of

 8  Government's Exhibit 69?

 9  A.  Once I received this information, I began to research the

10  address, which came back to 833 Hallvale Drive in White

11  Settlement, Texas.  I began to research that address to find

12  out who the occupants were, and the subpoena -- or the

13  subpoena returned showed that it was Larry Weast, and when I

14  checked.  It's a database available to law enforcement called

15  TLO that searches public records, and when I searched the name

16  Larry Weast and this address, one of the names that came up

17  was a Christopher Weast.

18  Q.  Once you did your research, what did you do at that

19  point?

20  A.  After researching this information, then I prepared a

21  search warrant for 833 Hallvale Drive in White Settlement

22  specifically for the computer items and anything that could

23  contain or transmit child pornography.

24  Q.  Did you execute a search warrant at 833 Hallvale Road?

25  A.  Yes.

Vol. 12:  29

1    Q.  When did you do that?

2    A.  It was on July 10, 2012.

3    Q.  How many people were with you in terms of executing that

4    search warrant?

5    A.  There were three other officers besides myself.

6    Q.  Who were they?

7    A.   It was my supervisor, Sergeant Thompson, Detective Murry

8    from the Crimes Against Children Unit, and then there was an

9    Officer Bukowski (phonetic) with White Settlement Police

10   Department.  He was a uniformed officer.  We're in plain

11   clothes.  So we always take a uniformed officer in a marked

12   unit no matter if it's in Fort Worth or another city, so there

13   is no confusion about who we are when we execute a warrant.

14   Q.  Do you recall, roughly, when it was that you went to 833

15   Hallvale in terms of time of day?

16   A.  We got to the residence.  It was about 10:15 in the

17   morning on that day.

18   Q.  Can you describe what happened when you got to the --

19        MR. CURTIS:  Your Honor, I reurge our objection to

20   the search warrant, the execution of the search warrant, and

21   any evidence found as a result of the search warrant.

22        THE COURT:  I overrule the objection.

23   A.  When we arrived at the residence, I went to the front door

24   and knocked.  The door was answered by a female, who was later

25   -- she identified herself as Bobbie Weast.  It was Christopher

```
 1    Weast's mother.  I told her that we had a search warrant, and
 2    she let us in the front door.
 3    BY MS. SALEEM:
 4    Q.  Now, without getting into what she said, what did you do
 5    next?
 6    A.  Well, the first thing we do is what we call clearing the
 7    house and securing it for our safety and theirs to make sure,
 8    you know, we know who is in the house and get the people in a
 9    central location so they can be watched, or if they choose to
10    leave -- nobody was at this point -- I didn't have an arrest
11    warrant, but for our safety and theirs, we have to keep
12    control while we do the search and execute the warrant.  So
13    that's what we did, and as soon as we got everybody into the
14    living room area, that's when I asked Christopher Weast to
15    speak with me in my car, which was outside in the street.
16    Q.  Now, who else was also at the residence besides Bobbie
17    Weast and Christopher Weast?
18    A.  The only other person there was -- well, there were three
19    small children that Ms. Weast babysat, and there was her
20    granddaughter, Kaela Lindsey, was also present.
21    Q.  Is she an adult or is she a child?
22    A.  She is an adult.
23    Q.  Did Mr. Weast -- was he cooperative with you?
24    A.  No --
25            MR. CURTIS:  Your Honor, may I approach the bench?
```

Vol. 12:  31

1          THE COURT:  Yes, you can approach.

2          MR. CURTIS:  Thank you, Your Honor.

3       (The following conference held at the bench out of the

4       hearing of the jury)

5          MR. CURTIS:  I object, Your Honor.  The government

6    just made a comment on the defendant's right to exercise his

7    right to self incrimination, his Fifth Amendment right.  I

8    also move for a mistrial -- Your Honor, I'm asking for an

9    instruction, of course, but I request and move for a

10   mistrial.

11         THE COURT:  I deny your request for a mistrial.  I

12   think --

13         MS. SALEEM:  That was all I was going to ask --

14         THE COURT:  What instruction would you like for me to

15   give the jury?

16         MR. CURTIS:  Your Honor, I would just request an

17   instruction and move for mistrial.

18         THE COURT:  I'm denying that.  Would you like me to

19   give the jury an instruction?

20         MR. CURTIS:  They should be instructed to disregard

21   the last answer of the witness as well as the one -- well, I

22   guess we better just go with the form -- as well as the

23   statement that he took him to the car --

24         THE COURT:  I don't think there was anything wrong

25   with that.  You all can go back.

Vol. 12:   32

1      (End of bench conference)

2          THE COURT:  Let me remind the jury that the defendant

3  has no obligation to be cooperative with law enforcement, and

4  if he chooses not to be, that's not relevant.  So to whatever

5  extent that had been brought out, the jury is not to consider

6  that for any purpose, the fact that he did not cooperate

7  because he had no obligation to.

8  BY MS. SALEEM:

9  Q.  Were any computer items seized from 833 Hallvale Road?

10         MR. CURTIS:  Renew my objection based on our motion

11  to suppress, Your Honor.

12         THE COURT:  I deny that.  I overrule that

13  objection.

14  A.  Yes.  We seized many computer items from the residence.

15  BY MS. SALEEM:

16  Q.  I'm going to ask you to take a look -- well, let me ask

17  you to -- Officer Watkins, were a number of photographs taken

18  in connection with the search warrant back on July 10, 2012?

19  A.  Yes.

20  Q.  I'm going to ask you to take a look at Government's

21  Exhibit -- first, let's start with Government's Exhibit 1 and

22  just let me ask you if you recognize that exhibit?

23  A.  Yes, I do.  That's 833 Hallvale Drive.

24  Q.  Is that a true and correct -- or a true and accurate

25  depiction of the way the house looked back in July of 2012?

Vol. 12:   33

1    A.   Yes.

2    Q.   I'm going to ask you to take a look now at Exhibits 2

3    through 29 and ask you if those are fair and accurate

4    depictions of the way the Hallvale residence looked back in

5    July of 2012?

6              MR. CURTIS:   Your Honor, and I object to those

7    exhibits based on our previous motion to suppress as well as

8    Government's 16, I believe, is a violation of 404(b) and 404

9    -- or Rule 403, Federal Rules of Evidence, more prejudicial

10   than probative.

11             THE COURT:   Okay.   That was Exhibits 1 through what?

12             MS. SALEEM:   29, Your Honor.

13             THE COURT:   Okay.   I'll overrule those objections.

14        As far as the Rule 403 objection is concerned, I find that

15   all of the photographs have probative value, and that

16   probative value would outweigh any inappropriate prejudice.

17   As a matter of fact, I don't find any inappropriate prejudice

18   that would even need to be weighed against them.

19        Exhibit 16 -- let me have the lawyers come up here a

20   minute to talk about Exhibit 16.   I can't tell what it

21   shows.

22        (The following conference held at the bench out of the

23        hearing of the jury)

24             THE COURT:   What is it about Exhibit 16 that causes

25   you a concern?

1          MR. CURTIS:  I'm sorry, Your Honor.  It appears to be

2     CDs of adult material, not child pornography.

3          THE COURT:  Okay.  Well, I'm going to overrule the

4     objection.  We don't have an instruction dealing with that

5     sort of thing.  So I overrule that objection.

6          (End of bench conference)

7          THE COURT:  So Exhibits 1 through 29 are received.

8     BY MS. SALEEM:

9     Q.  Officer Watkins, can you describe just very briefly what

10    are in Exhibits 2 and 3?

11    A.  Exhibits 2 -- or Exhibit 2 is just a photograph of the

12    living room area at the house at 833 Hallvale Drive, and

13    Bobbie Weast is sitting in a recliner, and Kaela Lindsey is

14    sitting on a couch.

15    Q.  And Exhibit 3, is that also the living room?

16    A.  Exhibit 3 is a picture of like a stand in the corner of

17    the living room by the recliner where Bobbie Weast was

18    sitting, and there is a white Dell computer on that stand.

19    Q.  Was that computer seized?

20    A.  Yes.

21    Q.  What about Exhibit 4 and 5?

22    A.  Exhibit 4 is just an overall picture of the kitchen and

23    dining room area of the house.  Exhibit 5 is a picture looking

24    from the dining room south down towards the bedrooms.  It's a

25    hallway.

Vol. 12:  35

1   Q.  Can you describe what is depicted in Exhibits 6 through

2   18?

3   A.  Exhibit 6 is an overall photograph -- it's a blue bedroom.

4   It was Christopher Weast's bedroom where he was staying.

5       Exhibit 7 is also in that same bedroom of Christopher

6   Weast, but it's an open closet door.

7       Exhibit 8 is an overall picture of a computer station area

8   in Christopher Weast's bedroom with a laptop computer monitor,

9   printer, and several computer items around this station.

10  Q.  And let me ask you, Officer Watkins, with respect to the

11  laptop that's depicted in Exhibit 8, does that actually appear

12  to be powered on or running?

13  A.  Yes, it is.

14  Q.  And is that the laptop computer that is going to be --

15  that you brought down here that is also Government's Exhibit

16  Number 37, which is the physical evidence behind you?

17  A.  Yes.  It's the same.  It's an HP laptop.

18      MR. CURTIS:  Your Honor, just as to Exhibit 37, same

19  objection.  Renew our objection, motion to suppress.

20      THE COURT:  I'll overrule the objection.

21  BY MS. SALEEM:

22  Q.  What about Exhibit 9?

23  A.  Exhibit 9 is a little bit closer up picture of an Apple

24  external hard drive on that computer station.

25  Q.  10?

Vol. 12:   36

1    A.   10 is another closer up picture of the computer station in

2    Christopher Weast's bedroom.

3    Q.   Exhibit 11?

4    A.   11 is a photograph of the back side of the HP laptop that

5    was collected from the computer station in Christopher Weast's

6    bedroom.

7    Q.   12?

8    A.   12 looks like the Western Digital external hard drive that

9    was connected to the HP laptop that was on the computer

10   station in Christopher Weast's bedroom.

11   Q.   And is that also -- did you bring that Western Digital

12   external hard drive, which is Government's Exhibit 38, with

13   you today?

14   A.   Yes.

15   Q.   What about Government's Exhibit 13?

16   A.   Exhibit 13 is an open door on the computer station, and

17   there are several containers of KY Jelly lotion in that

18   drawer.

19   Q.   Can you just generally describe what Exhibits 14 through

20   18 appear to be?

21   A.   14 is just -- taking photographs in the drawers of the

22   computer station in that same bedroom.  15 is, again, the

23   upper shelves of the computer station of what contents were on

24   the shelves.  16 is just some CDs that were on the computer

25   station.  17 is just a photograph of a Western Digital hard

1    drive that was in the computer station.  And 18 is, again --

2    it looks like a Samsung hard drive that was in the computer

3    station.

4    Q.   What about Exhibit 19?

5    A.   Exhibit 19 is a photograph looking from the blue bedroom,

6    which is Christopher Weast's bedroom, across the hall to the

7    northeast into the open door of what is Kaela Lindsey's

8    bedroom.

9    Q.   What is depicted in Exhibits 21 and 23?

10   A.   Did you say 20?

11   Q.   I'm sorry, 20 through 23.

12   A.   Exhibit 20 is an overall photograph of Kaela Lindsey's

13   bedroom, which is painted bright green.  21 is, again -- it's

14   just another like panoramic view of the green bedroom, just

15   another overall photograph.  And 22 is, again, another overall

16   photograph, which partially gets the computer station in Kaela

17   Lindsey's bedroom in that photograph.

18   Q.   Was that computer station as well seized?

19   A.   Yes.

20   Q.   What about Exhibit 23?

21   A.   Exhibit 23 is a close-up overall of the actual computer

22   station that was in Kaela Lindsey's bedroom.

23   Q.   Would you describe what's in Government's Exhibits 24, and

24   25 through 28?

25   A.   Exhibit 24 is -- it's a shot from like the kitchen area to

Vol. 12:  38

1    what's a -- I guess it was a converted garage, which I believe

2    was Larry and Bobbie Weast's bedroom.

3        26 is an overall shot in this bedroom of Larry and Bobbie

4    Weast of the computer station that's in their bedroom.

5    Q.  What about Exhibit 25?

6    A.  Exhibit 25 is just an overall shot of the bedroom, Larry

7    and Bobbie Weast showing the bed and the night stand and the

8    computer chair.  Again, 26 is the computer station in that

9    bedroom.

10   Q.  And was that computer station seized as well?

11   A.  Yes.  Exhibit 27 is just some computer items that were on

12   the -- beside the bed in that bedroom of Larry and Bobbie

13   Weast.  And 28 is a photograph from that bedroom into that

14   bathroom attached to that bedroom.

15   Q.  And what about Exhibit 29?

16   A.  Exhibit 29 is just a shot of some mail that was on the

17   counter or a little desk addressed to Christopher Weast, and

18   it has the address 833 Hallvale Drive, Fort Worth, Texas,

19   76108.

20   Q.  So all of the computer items that are depicted in these

21   photographs, they were, in fact, seized by you?

22   A.  Yes.

23   Q.  What happened at that point?

24   A.  Well, at that point, I had spoke with Bobbie Weast at the

25   house, and she -- I gave her like a -- basically, that the

1   search warrant was for child pornography at this residence,

2   and she, again --

3   Q.  Without getting into what anyone else said, what did you

4   do after that?

5   A.  Well, after we finished collecting the evidence and

6   speaking with the people there, then we left.  I left a copy

7   of the search warrant, the items that were taken, and I took

8   the items down to the Fort Worth Police Department property

9   room where they were tagged as evidence into the property

10  room.

11  Q.  And you mentioned earlier -- is Government's Exhibit 37,

12  the bulk evidence behind you, do you recognize that exhibit as

13  38?

14  A.  Yes.

15  Q.  What's Exhibit 37 and what's Exhibit 38?

16       MR. CURTIS:  I need to make the objection to 38, Your

17  Honor.  I renew my objection based on the search warrant -- I

18  mean, the motion to suppress.  Thank you, Your Honor.

19       THE COURT:  I'll overrule the objection.

20  A.  Exhibit 37 is the black HP laptop computer that was seized

21  from Christopher Weast's bedroom, and Exhibit 38 is the black

22  Western Digital external hard drive that was connected to the

23  HP laptop that was also seized from Christopher Weast's

24  bedroom.

25       THE COURT:  These are photographs of those items?

1          MS. SALEEM:  Yes, there are photographs, Your

2    Honor.

3          THE COURT:  Pardon?

4          MS. SALEEM:  Yes, there are photographs, Your Honor.

5          THE COURT:  Okay.  Are you offering those, too?

6          MS. SALEEM:  Not at this time, Your Honor.

7          THE COURT:  Okay.  Go ahead.

8          MR. CURTIS:  Your Honor, I think your question was,

9    were these photographs -- actually, those are the actual

10   items, 37 and 38, are the actual laptop and hard drive, I

11   believe.

12         THE COURT:  Well, where are they?

13         MS. SALEEM:  They are in a tub right next to Officer

14   Watkins.

15         THE COURT:  Okay.  Well, let's see what you're

16   talking about.  What exhibit number is that?

17         THE WITNESS:  This is Exhibit 37.

18         THE COURT:  And what's the other one?  And that's

19   Exhibit 38 you're holding up?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  Okay.  You're not offering those at the

22   time being?

23         MS. SALEEM:  No, Your Honor.

24         THE COURT:  Okay.  Put them back where they were.

25       Was he actually referring when he said earlier what 37 and

1    38 were?  Was he referring to photographs, or what was he

2    referring to?

3            MS. SALEEM:  He was referring to those exhibits, Your

4    Honor, the actual laptop --

5            THE COURT:  Okay.  Go ahead.

6    BY MS. SALEEM:

7    Q.  Now, Officer Watkins, after you -- I'm sorry.  What did

8    you do with the physical evidence, the computers and all the

9    property that was seized?

10   A.  Right after the search warrant, I took them to the Fort

11   Worth property room where they were tagged and placed into

12   evidence.  Then I notified Jim Willingham, which is one of the

13   forensic examiners with the police department, that they were

14   in property and gave them the service number and the

15   information he needed to perform the forensic analysis on

16   those items that were seized.

17   Q.  And after you provided Jim Willingham that information,

18   did you do anything else in connection with the

19   investigation?

20   A.  I did.  I also contacted the mother of the children that

21   were being babysat by Bobbie Weast --

22           MR. CURTIS:  Your Honor, I'm going to object to that

23   as -- that's irrelevant --

24           THE COURT:  I'm going to sustain that objection.  If

25   you want to revisit that later, you can explain to me why

1    you're offering it.

2          MS. SALEEM:  That's fine, Your Honor.

3    BY MS. SALEEM:

4    Q.  Specifically, Officer Watkins, did you have an opportunity

5    to review some of the forensic analysis of the images that

6    were provided by forensic examiner Willingham?

7    A.  Yes.  Once I got the -- once he completed the forensic

8    examination, I did get his report and reviewed it, yes.

9    Q.  Have you had an opportunity to look at Government's

10   Exhibit Number 42?

11   A.  Yes.

12   Q.  Do you recognize Exhibit 42?

13   A.  Yes.

14   Q.  How do you recognize Exhibit 42?

15   A.  This was one of the images that was downloaded from the IP

16   address while --

17          MR. CURTIS:  Your Honor, and I object to Government's

18   Exhibit 42 based on the motion to suppress we filed.

19          THE COURT:  I don't think it's been offered yet.  So

20   I'll overrule whatever you're doing now.

21      Go ahead.  You asked him what the exhibit was, or what was

22   the question?  Repeat the question.

23   BY MS. SALEEM:

24   Q.  The question is, how do you recognize Government's Exhibit

25   42?

Vol. 12:  43

1    A.  It was one of the images that was downloaded with the

2    software that I had from the IP address that was identified at

3    833 Hallvale Drive.

4    Q.  I'm going to ask you to take a look at Government's

5    Exhibit Number 78 and ask you if you recognize that exhibit.

6          MR. CURTIS:  I object to Government's Exhibit 78 as

7    well, Your Honor, based on the motion to suppress.

8          THE COURT:  I think all she's asking if he recognizes

9    it.

10        The last one he said he recognized Exhibit 42?

11         MS. SALEEM:  Yes, Your Honor.

12         THE COURT:  Okay.  She's now asking if you recognize

13   Exhibit 78.

14   A.  Yes, I do.

15   BY MS. SALEEM:

16   Q.  What is Government's Exhibit 78?

17   A.  That's a screen shot that I took of my computer screen

18   that shows both the Child Protection System --

19         MR. CURTIS:  I object to that as hearsay, Your Honor,

20   and I object under 404(b) and 403, Your Honor.

21         THE COURT:  I'll overrule the objection and --

22         MR. CURTIS:  And I also renew the motion to suppress

23   objection.

24         THE COURT:  I'll overrule that objection.  To the

25   extent it's 403, the relevance outweighs any -- if there were

Vol. 12:   44

1   any inappropriate prejudice, it outweighs it, and I don't

2   think there is.

3       Go ahead.

4   A.   This is the actual screen shot that I took of the computer

5   screen showing the Child Protection System software and the

6   Shareaza LE software running on this actual case with this IP

7   address loaded into the Shareaza LE and what files were

8   available.

9   BY MS. SALEEM:

10  Q.   What about Page 2 of Government's Exhibit 78?  Do you

11  recognize that?

12  A.   Yes.

13  Q.   What is that?

14  A.   That is a screen shot of the log file --

15       MR. CURTIS:   Your Honor, the same objection I made to

16  Page 1 of 78.

17       THE COURT:   Overruled.

18  A.   That's a screen shot of the log file where it shows the

19  computer nickname being Chris.

20       MS. SALEEM:   We would offer Government's Exhibit

21  Number 78 into evidence.

22       THE COURT:   It's received.

23  BY MS. SALEEM:

24  Q.   Finally, Officer Watkins, you had an opportunity to see a

25  number of people at the residence of 833 Hallvale.  I'm going

Vol. 12:   45

1    to ask you to take a look at Government's Exhibit Number 79

2    and see if you recognize the person in Exhibit 79?

3    A.   Yes.

4    Q.   Who is the person depicted in Exhibit 79?

5    A.   It's Christopher Weast.

6    Q.   Is that the individual that you met back on July 10 of

7    2012?

8    A.   Yes.

9            MS. SALEEM:   May I have just one moment, Your Honor?

10           THE COURT:   Yes.

11       (Brief pause in proceedings)

12           MS. SALEEM:   Pass the witness.

13           THE COURT:   Did you offer Exhibit 79?

14           MS. SALEEM:   78 -- oh, yes, Your Honor.   We offer

15   Exhibit 79.

16           THE COURT:   It's received.

17           MS. SALEEM:   We'll pass the witness.

18           THE COURT:   Okay.   Do you have any questions you want

19   to ask this witness?

20           MR. CURTIS:   I do, Your Honor.

21           THE COURT:   Okay.

22                       **CROSS EXAMINATION**

23   BY MR. CURTIS:

24   Q.   Officer Watkins, this program, Child Protective System, is

25   that what it's called?

Vol. 12:  46

1  A.  Yes, the Child Protection System, yes, sir.

2  Q.  Child Protection System.  It actually allows you to go

3  into somebody's shared file folder through the internet and

4  see what's in that shared file folder.  Is that correct?

5  A.  It -- the program does look -- it looks into the shared

6  folder with whoever set it up is offering for anyone to view

7  in that folder.  That's correct.

8           THE COURT:  How would somebody who didn't have your

9  kind of software get into that folder to see what was in

10  there?

11          THE WITNESS:  Your Honor, they would have the regular

12  peer-to-peer file sharing software, and if they type in a key

13  word searching for a particular item, if they have LimeWire,

14  BearShare, or several of the peer-to-peer file sharing

15  softwares, then those allow those persons to link up together,

16  and it tells this person is offering what you're looking for,

17  and it allows them to connect directly to that computer and

18  download what's in their shared folder.

19          THE COURT:  You mean over the internet people can

20  tell other people what they have in their folder and the other

21  people can get copies of it?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Is that what you did?

24          THE WITNESS:  Yes, sir.  That's what the software

25  showed me, and then I downloaded it, yes, sir.

Vol. 12:   47

1          THE COURT:  In order to get what you did, in order to

2    get somebody else's file folder, what's in it off of a

3    computer, do they have to have some kind of program where they

4    know you're going to do that?

5          THE WITNESS:  They have to have that same type of

6    file sharing software, and they have to put what they want to

7    share in that folder.  It doesn't allow access into their

8    whole computer, just their shared folder of what they choose

9    to share with others.

10          THE COURT:  Oh, okay.

11       Go ahead.

12          MR. CURTIS:  Thank you, Your Honor.

13   BY MR. CURTIS:

14   Q.  Officer, does that Child Protection Software allow you

15   to -- it allows you to go into shared file folders that may

16   have music, for example?

17   A.  The Child Protection System is searching a specific

18   database, which the FBI maintains, and it's not looking for

19   anything other than -- it shows me IP addresses that are

20   sharing what is either known or suspected child pornography.

21   Q.  And what about Shareaza?  That would actually allow you to

22   go into any kind of shared file folder, correct?

23   A.  Shareaza is just a download software.  That allows me to

24   connect with that IP address and then download what they're

25   offering to share.

1   Q.  But you can -- but it does allow you -- both of these

2   programs, you could go into somebody's computers and find

3   images that are not child pornography or suspected child

4   pornography, correct?

5   A.  It would only allow access to what their choosing to

6   share.

7   Q.  But that could be something other than child pornography,

8   couldn't it?

9   A.  Again, the program isn't specifically looking for a Shaw

10  value, which is the digital fingerprint of certain images.

11  It's not searching for just anything.  It's looking for

12  specific Shaw values.

13  Q.  But you're allowed to get into shared file folders and

14  find things other than child pornography.  In fact, you often

15  do --

16          THE COURT:  I think he's already answered the

17  question.  Let's go on to something else.

18  BY MR. CURTIS:

19  Q.  Do you often find child pornography -- items other than

20  suspected child pornography when you go and search somebody's

21  shared file?

22  A.  Not with this program.  Once they are seized with the

23  search warrant, and then, forensically, they, obviously, find

24  their files.

25  Q.  Okay.  With this program, does it allow you to actually go

Vol. 12:   49

1   in and mark files that you later come back with Shareaza and

2   download?

3   A.   No.   Once it goes in and identifies an IP address that is

4   offering shared child pornography, or suspected child

5   pornography, the Shareaza connects with that IP address when

6   that person goes online.   It doesn't allow anything to be

7   downloaded unless that person's online, also.   Once that

8   person comes online, it tries to connect, and then once it

9   makes a connection, it downloads those files from their shared

10   folder.

11   Q.   Now, in this particular case -- well, first of all,

12   neither of these programs, you can't actually see who the

13   person who is using that computer or is downloading that

14   image, correct?

15   A.   That's correct.

16   Q.   This particular computer that's before the jury today, you

17   entered on June 4 into the shared file folder, correct?

18   A.   That's when the first connection was made.   That's

19   correct.

20   Q.   And then downloaded some images on that date.   You didn't

21   download any other images on any other date other than the

22   June 4.   Is that correct?

23   A.   No, that's not correct.   It continuously tries to -- I

24   leave that software running all night long while I'm --

25   Q.   Okay.

Vol. 12:   50

1   A.  And it continuously tries to connect because you just

2   don't know when somebody is going to be online.

3   Q.  All right.  Did you try to go back into that computer on,

4   let's say, June 20 when you got the administrative subpoena?

5   A.  No, I did not after that date.

6   Q.  And you didn't go back any time around July 10 when you

7   actually executed the search warrant.  You didn't go back and

8   try to check the shared file folder, correct?

9   A.  No.

10   Q.  Now, there were several different computers in the house,

11   correct?

12   A.  That's correct.

13   Q.  All right.  Did you seize all the other computers that

14   were in the house?

15   A.  Yes.

16   Q.  Did you interview Mr. Larry Weast?

17   A.  I did not.

18   Q.  That would be the father, correct?

19   A.  Correct.

20   Q.  And, also, you testified seeing the computer nickname

21   Chris, but you can't testify for certain to this jury or tell

22   the jury for certain who was on that computer and who was

23   downloading these images, correct?

24   A.  That is correct.

25   Q.  Would you agree with me that these peer-to-peer programs,

Vol. 12:   51

1    they are susceptible to people being able to enter into your

2    computer and hack into your computer?

3    A.   I wouldn't agree with that, no, sir.

4    Q.   Okay.  Did you seize the wireless router when you executed

5    the search warrant?

6    A.   I did not.

7    Q.   Did you run a virus search on the computer that you did

8    seize?

9    A.   I didn't understand -- I didn't hear the question.

10   Q.   Did you run a virus search on, specifically, I believe

11   it's Government's Exhibit 37, the laptop?

12   A.   I don't run anything.  I collect it.  That would be a

13   question for the forensics examiner.  I don't tamper with -- I

14   take it straight to evidence and tag it.

15   Q.   That's fine.  And would your answer be the same for the

16   Western Digital hard drive?

17   A.   Correct.

18   Q.   Would you agree that viruses can make a computer

19   susceptible to being remotely accessed or hacked as we

20   understand that term?

21   A.   I would agree with that on occasion.

22   Q.   And when I say remote access or hacked, I mean somebody

23   else can get into the computer as if they are the actual user?

24   A.   Yes.

25   Q.   Okay.  And somebody who'd do that could download images

Vol. 12:  52

1    and any number of data, correct?

2    A.  I would say that's possible.

3    Q.  Thank you.

4         MR. CURTIS:  I'll pass the witness, Your Honor.

5         THE COURT:  Okay.  Do you have any more questions of

6    this witness?

7         MS. SALEEM:  No, Your Honor.

8         THE COURT:  Okay.  Can he be excused?

9         MS. SALEEM:  No objections from the government.

10        MR. CURTIS:  No objection, Your Honor.

11        THE COURT:  Okay.  You're excused as a witness.

12   Thank you.

13        THE WITNESS:  Thank you, Your Honor.

14        THE COURT:  Let's see.  It's almost 1 o'clock.  How

15   long was your next witness going to be?

16        MS. SALEEM:  Your Honor, our next witnesses are very

17   short.

18        THE COURT:  Let's go ahead and get those behind us

19   before we go to lunch.

20        MS. SALEEM:  I call Denise Wilkerson.

21        THE COURT:  Come up and be seated here.

22     Okay.  You may proceed.

23      DENISE WILKERSON, testified under oath as follows:

24                    **DIRECT EXAMINATION**

25   BY MR. COLE:

1    Q.  Ma'am, would you state your name, please?

2    A.  Denise Wilkerson.

3    Q.  And how are you employed?

4    A.  I'm employed by AT&T.

5    Q.  And what's your capacity there at AT&T?

6    A.  I am the lead billing operations manager responsible for

7    subpoena compliance.

8    Q.  Okay.  And are you also considered custodian of records?

9    A.  Yes, I am.

10   Q.  Okay.  And what are your duties in that capacity?

11   A.  I am responsible for training, preparing methods and

12   procedures, and overall support of the subpoena compliance

13   function.

14   Q.  Okay.  And since you are knowledgeable about subpoena

15   compliance, could you explain -- does AT&T respond to

16   subpoenas sent to SBC?  Is there a relationship between AT&T

17   and SBC?

18   A.  Yes, there is.  SBC is a d/b/a for AT&T.

19           THE COURT:  In other words, that's a name it uses

20   sometimes?

21           THE WITNESS:  Yes, it is.  We call it a misnomer.

22           THE COURT:  Okay.

23           THE WITNESS:  SBC is a company doing business under

24   the AT&T umbrella.

25           THE COURT:  Okay.

Vol. 12:   54

1    BY MR. COLE:

2    Q.   Okay.  And how long have you been employed in this

3    position?

4    A.   I've been employed in this position approximately 10 to 12

5    years.  I've been with the company 35 years.

6    Q.   Okay.  And does AT&T -- I know AT&T does several services,

7    but do they provide internet service as part of their

8    services?

9    A.   Yes, they do.

10   Q.   Does AT&T routinely maintain records in its normal and

11   ordinary course of business pertaining to internet service

12   customers?

13   A.   Yes.

14   Q.   Are these records normally relied upon by AT&T?

15   A.   Yes.

16   Q.   Okay.  Are these paper records, electronic records?  How

17   are these maintained?

18   A.   They are electronic records.

19   Q.   Okay.  And does AT&T begin to document these records at or

20   near the time a customer establishes service?

21   A.   Yes.

22   Q.   And do the entries in these records accurately reflect

23   information pertaining to AT&T internet customers?

24   A.   Yes.

25   Q.   And are you knowledgeable whether AT&T received any legal

1    process or subpoenas relating to any customer records relevant

2    to 833 Hallvale Drive in White Settlement, Texas?

3    A.   Yes, I am knowledgeable.

4    Q.   And was AT&T also in receipt of a subpoena requesting

5    information pertaining to IP address 99.71.201.174?

6    A.   Yes.

7    Q.   Okay.  And did you -- have you personally reviewed AT&T

8    records in response to those legal process?

9    A.   Yes, I have.

10   Q.   Have you conducted research in regards to that?

11   A.   Yes, I have.

12   Q.   Based upon your research, did you determine whether the

13   residence at 833 Hallvale Drive, White Settlement, Texas, was

14   an AT&T customer?

15   A.   Yes.

16   Q.   And during -- were you able to determine whether or not

17   this was a customer or not?

18   A.   Yes.

19   Q.   Okay.  And what was the name on the account?

20        MR. CURTIS:  Your Honor, I'm going to object to the

21   customer information based on my motion to suppress that was

22   overruled -- our motion to suppress that was already

23   overruled.

24        THE COURT:  Okay.  I overrule the objection.

25   BY MR. COLE:

Vol. 12:   56

1    Q.   Okay.   So you determined that 833 Hallvale Drive was a

2    residence where AT&T service was provided?

3    A.   Yes.

4    Q.   Okay.   And you indicated there was a name associated with

5    that?

6    A.   Yes.

7    Q.   Okay.   What was that?   Who was that name?

8    A.   The name on the account is Larry Weast.   There is a

9    sub-account of Chris -- chris@sbcglobal.net.

10   Q.   Okay.   And through your research and review of accounts,

11   were able to determine whether or not this address was an AT&T

12   internet customer during the year 2012?

13   A.   Yes.

14   Q.   Specifically, during the months of June and July 2012?

15   A.   Yes.

16   Q.   I'm going to -- there is a notebook in front of you.   I'm

17   going to ask you to turn to tab Number 69, and I would ask you

18   to review those documents?

19   A.   Yes.   I am looking at these documents, and they are the

20   documents that I have previously researched.

21   Q.   Okay.   So you recognize those documents.   What are they?

22   A.   The first page is a customer account detail, which

23   specifies the IP address associated with the account and cross

24   references it to the actual billing account for the U-Verse

25   customer.

Vol. 12:   57

1        The second page is the actual account, the billing

2   account, under the name Larry Weast.  The third page is a

3   business record certification, which attests to the

4   authenticity of the records.  And the fourth page is an AT&T

5   legal compliance document that indicates that the records came

6   from AT&T.

7   Q.  Okay.  And are these documents and the information

8   obtained in these documents an accurate reflection of the

9   information you observed when you personally conducted

10  research into this account?

11  A.  Yes.

12          MR. COLE:  Your Honor, the government would offer

13  Exhibit 69.

14          MR. CURTIS:  Your Honor, I renew my objection based

15  on the motion to suppress.

16          THE COURT:  It's received.

17          MR. COLE:  Pass the witness, Your Honor.

18          THE COURT:  Do you have any questions of this

19  witness?  Can this witness be excused?

20          MR. CURTIS:  We pass the witness, Your Honor.

21          THE COURT:  Can the witness be excused?

22          MS. SAAD:  No objection, Your Honor.

23          THE COURT:  Okay.  You're excused as a witness.

24  Thank you.

25          THE WITNESS:  Thank you.

1          THE COURT:  Okay.  Call the next short one.

2          MS. SALEEM:  I call Shawn Murry.

3          THE COURT:  Okay.  You may proceed.

4          SHAWN MURRY, testified under oath as follows:

5                      **DIRECT EXAMINATION**

6    BY MS. SALEEM:

7    Q.  Can you please state your name?

8    A.  Shawn Murry.

9    Q.  Where do you work?

10   A.  Fort Worth Police Department.

11   Q.  Were you assisting Officer Randy Watkins on a search

12   warrant back on July 10, 2012?

13   A.  Yes, ma'am.

14   Q.  Did you assist with the chain of custody with processing

15   items that were seized from the Hallvale residence and making

16   sure that they were transported and tagged at Fort Worth PD?

17   A.  Yes, ma'am.

18   Q.  Specifically, there is a tub behind you that contains

19   Government's Exhibits 37 and 38.  Do you recognize those two

20   exhibits?

21   A.  I do.

22   Q.  What is 37?

23   A.  37 is the Hewlett Packard HP Pavilion entertainment PC.

24   Q.  Is that the laptop that you also participated in

25   seizing?

Vol. 12:  59

1    A.  Yes, ma'am.

2    Q.  38, what is that?

3    A.  It's the Western Digital external hard drive.

4    Q.  Did anything happen between the time that you assisted

5    with seizing the items and turning them into the Fort Worth

6    Police Department for property maintenance?

7    A.  Nothing other than just transporting to the property room.

8            MS. SALEEM:  We'll pass the witness.

9            THE COURT:  Where did Exhibit 37 come from in the

10   house?

11           THE WITNESS:  It came from Mr. Weast's bedroom on a

12   computer desk.

13           THE COURT:  Well, there was more than one Mr. Weast

14   in the house, apparently.

15           THE WITNESS:  Christopher Weast was in the house.

16           THE COURT:  Okay.  And where did Exhibit 38 come

17   from?

18           THE WITNESS:  The same bedroom on the same computer

19   desk.

20           THE COURT:  Okay.  Did you offer those?

21           MS. SALEEM:  Not yet, Your Honor.

22           THE COURT:  Okay.  Do you have any questions you want

23   to ask him?

24           MS. SAAD:  Your Honor, we would just maintain our

25   objection to 37 and 38 for the motion to suppress.  And, yes,

Vol. 12:   60

1    I do have some questions.

2           THE COURT:   Okay.   I'll overrule your objection.

3                       **CROSS EXAMINATION**

4    BY MS. SAAD:

5    Q.   Agent Murry, you -- or Officer Murry, you did an inventory

6    when seizing property from the house?

7    A.   Yes, ma'am.

8    Q.   You never seized any wireless router from the home?

9    A.   No, ma'am.

10   Q.   In terms of other physical evidence, you didn't get any

11   type of fingerprint, anything else that would -- anything like

12   that from the home?

13   A.   No, ma'am.

14          MS. SAAD:   No further questions.

15          THE COURT:   Okay.   Can he be excused as a witness?

16          MS. SALEEM:   No objections, Your Honor.

17          THE COURT:   Okay.   You're excused as a witness.

18   Okay.   We're going to take a lunch break.   We'll be back

19   at five minutes after 2:00.   And remember what we talked about

20   putting your badge on and keeping it on your outer garment at

21   all times when you're around the courthouse or in the

22   courthouse.   And don't talk about the case.   Remember all

23   those instructions I gave you.   Thank you.

24      (Trial recesses, 1:05 p.m.)

25                          -oOo-

Vol. 12:   61

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Randy Watkins | 20 | 45 | | |
| Denise Wilkerson | 52 | | | |
| Shawn Murry | 58 | 60 | | |

-oOo-

E X H I B I T S

| Exhibit Number | Offered | Admitted |
|---|---|---|
| Government's 1 through 29 | 33 | 34 |
| Government's 78 | 44 | 44 |
| Government's 79 | 45 | 45 |
| Government's 69 | 57 | 57 |

-oOo-

CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.

s/  Ana P. Warren                          January 16, 2015
Ana P. Warren, CSR #2302                        Date
U.S. District Court Reporter

U.S. DISTRICT COURT